## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Donald W. Weber,                          Case No. 16-cv-332 (JNE/TNL)

        Plaintiff,

v.                                         **REPORT &**
                                          **RECOMMENDATION**
Carolyn W. Colvin,
Acting Commissioner of Social Security,

        Defendant.

Fay E. Fishman, Peterson & Fishman, 3009 Holmes Avenue South, Minneapolis, MN 55408 (for Plaintiff); and

Gregory G. Brooker, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

Plaintiff Donald W. Weber brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment (ECF No. 15) and the Commissioner's Motion for Summary Judgment (ECF No. 17). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Joan N. Ericksen, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 15) be **GRANTED IN PART** and **DENIED IN PART**; the Commissioner's Motion for Summary Judgment (ECF No. 17) be **DENIED**; and this matter be **REMANDED** for further proceedings.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB as well as supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382, on September 5, 2012, asserting that he has been disabled since May 28, 2009, due to ADHD; depression; eye disorders, specifically Fuchs' dystrophy,[1] glaucoma, and cataracts; knee and back problems, including degenerative disk disease; sleep apnea; and hypertension.  (Tr. 69-70, 80-81, 95-96.)  Plaintiff was determined to be disabled as of September 5, 2012, under Title XVI and began receiving SSI.  (Tr. 93, 96.)  Plaintiff's application for DIB, however, was denied initially, and again upon reconsideration.  (Tr. 13, 79, 95.)  Plaintiff appealed the reconsideration of his DIB determination by requesting a hearing before an administrative law judge ("ALJ").  (Tr. 13, 145-50.)

The ALJ held a hearing on July 2, 2014.  (Tr. 13, 26, 28; *see also* Tr. 105-47, 162-88, 193-99.)  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied his request for review.  (Tr. 1-25.)

---

[1] "Fuchs' . . . dystrophy is an eye disease in which cells lining the inner surface of the cornea slowly start to die off. The disease usually affects both eyes."  *Fuchs dystrophy*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/ency/article/007295.htm (last visited on Jan. 9, 2017).  "Fuchs' dystrophy affects the thin layer of cells that line the back part of the cornea. These cells help pump excess fluid out of the cornea. As more and more cells are lost, fluid begins to build up in the cornea, causing swelling and a cloudy cornea."  *Id.*

Plaintiff then filed the instant action, challenging the ALJ's decision.  (Compl., ECF No. 1.)  The parties have filed cross motions for summary judgment.  (ECF Nos. 15, 17.) This matter is now fully briefed and ready for a determination on the papers.

## III. RELEVANT MEDICAL HISTORY

As noted above, Plaintiff was found to be eligible for SSI as of September 5, 2012. In order to be entitled to DIB, Plaintiff must establish that he was disabled before his insurance expired.  *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)).  It is undisputed that the date Plaintiff was last insured was June 30, 2010.  (Tr. 15; Pl.'s Mem. in Supp. at 2, ECF No. 16; Def.'s Mem. in Supp. at 3, ECF No. 18.)  Thus, Plaintiff must prove that he was disabled before June 30, 2010.  Accordingly, the period presently at issue is May 28, 2009, the alleged onset date, through June 30, 2010, the date last insured.  Nevertheless, "[e]vidence from outside the insured period can be used in helping to elucidate a medical condition during the time for which benefits might be rewarded."  *Cox*, 471 F.3d at 907 (quotation omitted).

### A. 2009

Near the end of August 2009, Plaintiff met with Azber A. Ansar, M.D., at the VA Medical Center to reestablish primary care.  (Tr. 484-85.)  Plaintiff had several complaints, including knee and back pain, high blood pressure, a "feeling of hopelessness," and fatigue during the day accompanied by snoring at night.  (Tr. 484.)

With respect to Plaintiff's mental health, Dr. Ansar noted that Plaintiff had previously received treatment for depression in 2006, but would need to reestablish care.

3

(Tr. 485.)  Dr. Ansar also noted that Plaintiff had attempted suicide in 2003.  (Tr. 485.)
Dr. Ansar noted that Plaintiff's blood pressure was "uncontrolled" and prescribed
hydrochlorothiazide/lisinopril[2] as well as dietary and lifestyle modifications.  (Tr. 485;
see Tr. 490-92.)  Dr. Ansar noted that Plaintiff was obese and wanted to lose weight, and
referred Plaintiff to a program.  (Tr. 485.)

As for Plaintiff's low-back and knee pain, Dr. Ansar noted that the pain was
secondary to a fall Plaintiff experienced approximately six weeks before.  (Tr. 485; see
Tr. 308-10, 326.)   Dr. Ansar prescribed diclofenac sodium and ordered x-rays of
Plaintiff's right knee and lumbar spine.  (Tr. 485; see Tr. 338-39.)   Dr. Ansar also
referred Plaintiff for a sleep study to evaluate whether Plaintiff has sleep apnea.  (Tr.
485.)

The same day, Plaintiff was also evaluated by Beret A. Skroch, Psy. D., L.P.  (Tr.
486-88.)  Plaintiff expressed interest in reconnecting with Alan Serposs, M.D., his prior
psychiatrist.  (Tr. 486; see Tr. 475.)  Plaintiff reported that he last saw Dr. Serposs in
2006, at which time he was diagnosed with ADHD and depression and prescribed
Wellbutrin.[3]   (Tr. 486; see Tr. 475.)   Plaintiff reported that "[h]e stopped taking
psychotropic medications in 2006 and reported [a] stable mood since."   (Tr. 486.)
Plaintiff "denied feeling depressed despite significant psychosocial stressors," including
losing his driver's license for failure to pay child support which then resulted in the loss
of his job as a taxi driver.  (Tr. 486.)  Plaintiff reported that he was "actively looking for

---

[2] This medication "is used to treat high blood pressure."  *Lisinopril and Hydrochlorothiazide*, MedlinePlus, U.S.
Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601070 html (last visited on Jan. 11, 2017).
[3] Wellbutrin is a brand name for bupropion, an antidepressant.  *Bupropion*, MedlinePlus, U.S. Nat'l Library of
Medicine, https://medlineplus.gov/druginfo/meds/a695033.html (last visited on Jan. 9, 2017).

work" and denied any hopelessness or suicidal or homicidal ideation, intentions, or plans. (Tr. 486.)  Plaintiff also reported having "close friends for support."  (Tr. 487.)

Skroch noted that Plaintiff was obese, was casually dressed, had fair grooming, and made good eye contact.  (Tr. 487-88.)  Plaintiff's affect was euthymic and his thought content was normal.  (Tr. 488.)  Plaintiff's motor functions were "calm" and his speech had normal rate, rhythm, and volume.  (Tr. 488.)  Plaintiff's insight, judgment, and impulse control were fair.  (Tr. 488.)  Skroch diagnosed Plaintiff with depressive disorder by history, but not currently symptomatic, and ADHD.  (Tr. 488.)  Plaintiff had a GAF score of 70.[4]  (Tr. 488.)  Skroch noted that Plaintiff "is not in need of, nor does he desire [mental health] services at present" and told him to contact Dr. Serposs in the future if needed.  (Tr. 488.)

Towards the end of September, Plaintiff participated in a sleep study.  (Tr. 480-82.)  Ultimately, Plaintiff was diagnosed with obstructive sleep apnea and instructed on the use of a continuous positive airway pressure ("CPAP") unit.  (Tr. 476-77, 480-81, 482.)

At the end of September, Plaintiff was seen by Allan J. Boyum, M.D., for a follow-up regarding high blood pressure and back and knee pain.  (Tr. 477.)  Plaintiff reported that "[h]is back and knees are slowly getting better."  (Tr. 477.)  Dr. Boyum noted that Plaintiff was alert and oriented and "[i]n [a] good mood."  (Tr. 479.)

---

[4] "The GAF scale measures 'psychological, social, and occupational functioning' on a 1 to 100 scale." *Wright v. Colvin*, 789 F.3d 847, 854 n.4 (8th Cir. 2015) (quoting Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 1994)).  "A GAF score of 65 or 70 reflects some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning but generally functioning pretty well, has some meaningful interpersonal relationships."  *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) (quotation omitted).

Plaintiff's gait was steady and at a normal pace.  (Tr. 479.)  Dr. Boyum continued Plaintiff's blood-pressure medication and prescribed diclofenac and cyclobenzaprine for Plaintiff's neck pain.  (Tr. 480.)

Plaintiff met with Dr. Serposs in early October for supportive psychotherapy and medication management in connection with his depressive disorder.  (Tr. 475.)  Dr. Serposs noted that he previously treated Plaintiff "in 2005-06 for . . . depressive disorder. [Plaintiff] dropped out of treatment and returned . . . this past August and reported some return of depressive symptoms."  (Tr. 475.)  Dr. Serposs noted that, while Plaintiff "was ambivalent" about resuming mental-health treatment when he saw Skroch, "more recently [Plaintiff] called and asked to come in."  (Tr. 475.)  Dr. Serposs noted that Plaintiff had "a number of current stressors," including the loss of his driver's license and job as a taxi driver as well as being "a few months behind on his rent" and having less contact with his teenage son.  (Tr. 475; *see* Tr. 476.)  Dr. Serposs noted that, while Plaintiff "faces the possibility of losing his housing[,] . . . he is on good terms with his landlord who in fact may be able to find him work."  (Tr. 475.)  Dr. Serposs noted Plaintiff's suicide attempt in 2003 and that Plaintiff was not presently suicidal.  (Tr. 475.)

Dr. Serposs observed that Plaintiff was casually dressed, adequately groomed, and fully cooperative with normal speech, logical thinking, and a moderately depressed mood.  (Tr. 475.)  Plaintiff's affect was appropriate.  (Tr. 475.)  Dr. Serposs noted that Plaintiff had previously responded to bupropion[5] and was willing to try this medication

---

[5] *See supra* n.3.

again.  (Tr. 476.)  Dr. Serposs prescribed bupropion and advised Plaintiff to return in three weeks.  (Tr. 476.)

When Plaintiff returned near the end of October, there was "little change" since his previous appointment.  (Tr. 474.)  Plaintiff was still actively looking for work and "his housing situation [wa]s precarious."  (Tr. 474.)  Plaintiff again appeared casually dressed, adequately groomed, and fully cooperative with normal speech and logical thinking.  (Tr. 474.)  Plaintiff's mood was moderately depressed and his affect was appropriate.  (Tr. 474.)  Dr. Serposs increased the bupropion and advised Plaintiff to return in three weeks.  (Tr. 474.)

Plaintiff followed up with Dr. Boyum in early November for persistent back and knee pain.  (Tr. 470-71.)  Plaintiff reported that he had received some physical therapy "which does not seem to have been helpful."  (Tr. 471.)  Plaintiff experienced some relief with diclofenac in the morning, but the pain returned by the afternoon.  (Tr. 471.)  Plaintiff was observed to be in a good mood with a normal pace and steady gait.  (Tr. 472.)  Dr. Boyum diagnosed Plaintiff with degenerative disk disease and degenerative joint disease.  (Tr. 473; *see* Tr. 338-39.)  Dr. Boyum increased the diclofenac, prescribed a back brace, and referred Plaintiff for a possible injection in his right knee.  (Tr. 473.)

Plaintiff met with Dr. Serposs again in mid-November and early December.  (Tr. 468, 469.)  Plaintiff remained much the same.  He was under financial strain and continued to look for work.  (Tr. 468, 469.)  Plaintiff presented with a depressed mood each time.  (Tr. 468, 470.)  Dr. Serposs continued Plaintiff's bupropion prescription and, in December, Plaintiff reported "feel[ing] a bit more 'get up and go.'"  (Tr. 468, 470.)

7

Plaintiff also had an orthopedic consult for his right knee in early December.  (Tr. 466.)  Plaintiff was seen by David Fey, M.D.  (Tr. 467.)  Plaintiff described "chronic wax[ing] and waning and popping and snapping in his knee especially with stairs."  (Tr. 467.)  Plaintiff reported increased pain "especially with flexion and extension type motions" since his fall in July and "some numbness."  (Tr. 467.)  Dr. Fey observed that Plaintiff had "a slightly antalgic gait," but

> [t]here is no effusion.  His knee is relatively stable to varus and valgus stress as well as Lachman's maneuvers.  He had good range of motion.  There is some nonspecific medial tenderness, no medial joint line tenderness.  He does have some patellofemoral crepitants [sic].  He does describe some decreased sensation about the anterolateral patella.

(Tr. 468.)  Dr. Fey also reviewed x-rays taken in August, which showed "minimal degenerative changes" but were "otherwise unremarkable."  (Tr. 468; *see* Tr. 338.)  Dr. Fey diagnosed Plaintiff with "very mild degenerative arthritis of the patellofemoral joint" and prescribed a knee sleeve.  (Tr. 468.)

Plaintiff was seen for a routine eye exam at the end of December.  (Tr. 462.)  Plaintiff expressed concerns about glaucoma, noting a family history and increased pressure in his eye during an exam in July.  (Tr. 462.)  Glaucoma was suspected given Plaintiff's family history, borderline intraocular pressure, and "suspicious nerves" as well as the early stages of cataracts.  (Tr. 463).  Additional testing was recommended.  (Tr. 463.)

Plaintiff also had an appointment with Dr. Serposs at the end of December.  (Tr. 461.)  While Plaintiff remained unemployed, he reported doing "some odd jobs for his

landlord thus he has a place to stay." (Tr. 461.)  Plaintiff also felt that the bupropion was improving his mood and Dr. Serposs noted some improvement as well. (Tr. 461.)  Dr. Serposs continued Plaintiff's medication and directed him to return in five weeks. (Tr. 462.)

### B. 2010

Plaintiff next saw Dr. Serposs at the beginning of February 2010. (Tr. 460.) Plaintiff reported that the increase in bupropion "has been helpful to his mood and outlook." (Tr. 460.)  Plaintiff also reported that he was planning to go to a job fair in the next week or so. (Tr. 460.)  Plaintiff was casually dressed, adequately groomed, and fully cooperative with normal speech and a logical thought process. (Tr. 460.)  His affect was appropriate and his mood was moderately depressed. (Tr. 460.)  Dr. Serposs instructed Plaintiff to continue taking bupropion and return in one month. (Tr. 461.)

Plaintiff had a follow-up ophthalmology appointment in mid-February. (Tr. 456.) After additional testing, Plaintiff was diagnosed with glaucoma and Fuchs' dystrophy. (Tr. 459.)

Plaintiff met with Dr. Serposs a few weeks later, in the beginning of March. (Tr. 452.)  Plaintiff reported that his mood was "fair despite the fact that he has still not found work." (Tr. 452.)  Plaintiff was doing "a few odd jobs for his landlord which gives him a little money and he continues to look for work." (Tr. 452.)  Plaintiff reported that the bupropion was "helpful." (Tr. 452.)  Dr. Serposs described Plaintiff's mood as mildly depressed. (Tr. 425.)  Plaintiff was directed to return in four weeks. (Tr. 452.)

Plaintiff saw Dr. Serposs again in the beginning of April. (Tr. 448.) Plaintiff continued to look for work and "felt quite discouraged in this regard." (Tr. 449.) Plaintiff also continued to have financial difficulties. (Tr. 449.) Plaintiff's mood was depressed, but he continued to exhibit adequate grooming, full cooperation, normal speech, logical thinking and an appropriate affect. (Tr. 449.) Dr. Serposs added citalopram[6] to Plaintiff's medications and directed him to return in three weeks. (Tr. 449-50.)

Around this time, Plaintiff's comprehensive treatment plan was updated. (Tr. 450-51.) Plaintiff's problems were described as depression, interpersonal conflict, and difficulty coping with chronic pain. (Tr. 450.) Plaintiff's goals and objectives were to (1) "[d]ecrease depressive symptoms through continued medication adjustment and therapy with Dr. Serposs"; (2) "[c]ontinue to work on finding a job"; (3) "[r]econnect with . . . [his teenage] son," whom he had not seen in one year and did not know where he was; and (4) reduce chronic pain through medication management. (Tr. 450.) Plaintiff's diagnoses were major depressive disorder and ADHD by history. (Tr. 451.) Plaintiff's current GAF score was 50.[7] (Tr. 451.)

Plaintiff also followed up with ophthalmology in early April in connection with Travatan[8] eye drops he had begun six weeks ago. (Tr. 445-48.) Plaintiff's intraocular pressure had decreased with the drops. (Tr. 446.) Plaintiff reported some worsening of

---

[6] "Citalopram is used to treat depression." *Citalopram*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a699001 html (last visited on Jan. 9, 2017).

[7] "A GAF of 41 to 50 indicates the individual has serious symptoms or any serious impairment in social, occupational, or social functioning." *Martise v. Astrue*, 641 F.3d 909, 917 n.5 (8th Cir. 2011) (quotation omitted).

[8] Travatan Z is a brand name for travoprost ophthalmic, a solution that "'lowers pressure in the eye by increasing the flow of natural eye fluids out of the eye," and is used to treat glaucoma. *Travoprost Opthalmic*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a602027 html (last visited on Jan. 9, 2017).

his vision.  (Tr. 446.)  Plaintiff was directed to continue using the drops and return in six months.  (Tr. 446.)

Plaintiff saw John E. Bassett, M.D., around the same time for back pain.  (Tr. 442.)  Dr. Bassett noted that Plaintiff had "chronic low back pain and wears a back brace."  (Tr. 442.)  Plaintiff could not recall a particular incident leading to his back pain.  (Tr. 442.)  Plaintiff's pain was "localized, nonradiating, except for occasional, sharp, stabbing, burning pains in the infrascapular area midline."  (Tr. 442.)  Neither diclofenac nor cyclobenzaprine helped with this pain.  (Tr. 442.)

Dr. Bassett noted that physical therapy was previously ordered by Dr. Boyum in August 2009.  (Tr. 443.)  Dr. Bassett offered to refer Plaintiff to physical therapy, but Plaintiff declined.  (Tr. 443.)  Upon examination, Plaintiff was "slightly tender in the midthoracic area below the scapula bilaterally."  (Tr. 443.)  Plaintiff's range of motion was limited due to his back and knee braces.  (Tr. 443.)  Otherwise, Plaintiff's flexion was normal and his lateral flexion was "fairly normal bilaterally."  (Tr. 443.)  Plaintiff could "stand on either leg supported without change in pain in his back."  (Tr. 443.)  Dr. Bassett diagnosed Plaintiff with midthoracic back pain and chronic lumbar back pain.  (Tr. 443.)  Dr. Bassett prescribed a trial of hydrocodone/acetaminophen[9] for one month along with heat and massage if desired.  (Tr. 443.)  Dr. Bassett instructed Plaintiff to call back if he wanted physical therapy.  (Tr. 443.)  Dr. Bassett also instructed Plaintiff that "[h]e need not use cyclobenzaprine if it is not effective."  (Tr. 443.)  Lastly, Dr. Bassett

---

[9] Vicodin is one brand name for this opioid/acetaminophen combination, which is used to treat pain. *Hydrocodone/Acetaminophen (By mouth) (Vicodin)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010590/ (last visited on Jan. 9, 2017).

noted that both Plaintiff's blood pressure and cholesterol were "well controlled." (Tr. 443.)

Towards the end of April, Plaintiff had another appointment with Dr. Serposs. (Tr. 441.)  Plaintiff reported "some benefit from the addition of citalopram" and stated that the Vicodin[10] prescribed by Dr. Bassett was helping.  (Tr. 441.)  While Plaintiff did "not have regular work yet," he continued to pick up odd jobs.  (Tr. 441.)  Dr. Serposs observed that Plaintiff was casually dressed, adequately groomed, and fully cooperative with normal speech, logical thinking, and an appropriate affect.  (Tr. 441.)  Dr. Serposs described Plaintiff's mood as moderately depressed.  (Tr. 441.)  Dr. Serposs increased Plaintiff's citalopram, continued bupropion, and instructed Plaintiff to return in one month. (Tr. 442.)

Plaintiff had another ophthalmology appointment in May with complaints of changes in his distance vision.  (Tr. 439; *see* Tr. 439.)  Plaintiff's external eye exam was within normal limits.  (Tr. 438.)  Plaintiff was directed to continue the Travatan drops and given a new glasses prescription.  (Tr. 438.)

Between approximately mid-May through mid-September, Plaintiff continued to meet with Dr. Serposs on a monthly basis.  (Tr. 431, 432, 434, 435, 436.)  At each of these visits, Plaintiff reported that the combination of bupropion and citalopram was helpful.  (Tr. 431, 434, 433, 435, 437.)  Plaintiff remained without regular employment, but continued to work for his landlord.  (Tr. 431, 434, 435, 437.)  During this time, Plaintiff reported being "somewhat angry and hurt" when his son did not call on Father's

---

[10] *See id.*

Day.  (Tr. 434.)  Plaintiff also reported that his daughter, who was living in New York, had a baby boy, and he was "pleased" to be a grandfather.  (Tr. 433.)  During this time, Dr. Serposs noted that Plaintiff's mood fluctuated between moderately depressed and mildly depressed, but generally showed improvement.  (Tr. 431, 433, 434, 435, 437.)  Dr. Serposs continued Plaintiff's medications without adjustment.  (Tr. 432, 433, 435, 436, 437.)

In the middle of September, Plaintiff's blood pressure was taken in connection with his mental-health appointment.  (Tr. 429.)  Plaintiff's blood pressure was elevated and Plaintiff was instructed to "decreas[e] caffeine as [he] had eaten chocolate prior to [the] visit."  (Tr. 429.)  Plaintiff was further instructed to recheck his blood pressure at home and call if it remained high.  (Tr. 429.)

At the end of September, Plaintiff had a follow-up appointment with Dr. Bassett. (Tr. 426.)  Plaintiff continued to report low back and knee pain, but the knee pain was now greater in his left knee.  (Tr. 436.)  Dr. Bassett noted that Plaintiff had "rationed his Vicodin," and not taken any in the past two months.  (Tr. 426.)  Plaintiff continued doing odd jobs for his landlord.  (Tr. 426.)  Plaintiff remained estranged from his son.  (Tr. 427.)  Upon examination, Dr. Bassett noted:

> An obese man who walks favoring his back, cannot get out of a chair without using his arms.  Cannot balance on either knee.  Knees can be fully extended.  Flexion to 90 degrees. No effusion.  No point tenderness in the medial, lateral, or peripatellar spaces.

(Tr. 427.)

Dr. Bassett assessed Plaintiff with chronic back pain and continued the Vicodin. (Tr. 427.)  Dr. Bassett noted Plaintiff was trying to pursue disability benefits.  (Tr. 427.) Dr. Bassett continued Plaintiff's blood-pressure medication and "[s]trongly recommended greater dietary caloric restriction" as Plaintiff "is unlikely to be able to perform more physical exercise."  (Tr. 427.)

Approximately one month later, Plaintiff had another follow-up appointment with ophthalmology, where he reported "a slight decrease in vision."  (Tr. 420, 424.) Plaintiff's intraocular pressure had again decreased.  (Tr. 425.)  Cosopt[11] drops were prescribed.  (Tr. 422, 593.)

The following day, Plaintiff met with a nurse for his mental-health appointment because Dr. Serposs was out of town.  (Tr. 416.)  The nurse noted:

> He says his mood has been "up and down," depending on how he is feeling about his prospects for disability and his job situation.  He has applied for service connection for his back and is waiting for a response, which he thinks should come soon, as it's been a year.  In the mean-time [sic], he spends his days [playing] game "apps" on Facebook ("I may be addicted"), watching TV, doing some odd jobs for his landlord and looking for other work.

(Tr. 416-17; *see* Tr. 414, 589.)  Plaintiff reported being in contact with his daughter regularly but felt bad that he was not able to go to New York to see the baby.  (Tr. 417; *see* Tr. 414.)  Plaintiff was still waiting to hear back from his son.  (Tr. 416; *see* Tr. 414.) Plaintiff reported that his driver's license had been reinstated.  (Tr. 417.)  Plaintiff

---

[11] Cosopt is a brand name for solution of dorzolamide and timolol, which "is used to treat eye conditions, including glaucoma and ocular hypertension, in which increased pressure can lead to a gradual loss of vision." *Dorzolamide and Timolol Opthalmic*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a602022 html (last visited Jan. 9, 2017).  The solution "lowers pressure in the eye by decreasing the production of natural fluids in the eye." *Id.*

reported being worried about his "'borderline Glaucoma.'"  (Tr. 417.)  Plaintiff continued

to find bupropion and citalopram helpful without adverse side effects.  (Tr. 417.)

The nurse observed that Plaintiff had adequate hygiene and was pleasant and

talkative.  (Tr. 419.)  Plaintiff smiled and laughed "readily."  (Tr. 419.)  Plaintiff's speech

was normal and there was no thought disturbance.  (Tr. 419; *see* Tr. 589.)  Plaintiff was

"[a]lert with good eye contact and good recall of recent and remote events and details,"

and his judgment and insight were adequate.  (Tr. 419.)  The nurse noted that,

approximately half way through the session, Plaintiff squirmed and "appear[ed] to try and

stretch his back."  (Tr. 419.)  The nurse described Plaintiff as "stable" on citalopram and

bupropion.  (Tr. 419.)  She noted that Plaintiff did "not want to pursue vocational

resources through [the] VA until he hear[d] about the [service-connection disability]."

(Tr. 419; *see* Tr. 413-14, 589.)  The nurse gave Plaintiff a GAF score of 50.[12]  (Tr. 590.)

Plaintiff had appointments with both Dr. Serposs and ophthalmology towards the

end of November.  (Tr. 407-12.)  During his appointment with Dr. Serposs, Plaintiff

reported that "his mood continues to be up and down some."  (Tr. 411.)  Plaintiff was

however, pleased to have his driver's license back and to be communicating with his

daughter and grandson.  (Tr. 411.)  Plaintiff told Dr. Serposs that "he does not think he

will return to driving [a] cab as he would have to retake coursework to get his cab license

back and he does not have the money for this."  (Tr. 411.)  Plaintiff was "planning to look

for delivery driver jobs."  (Tr. 411.)  Dr. Serposs described Plaintiff's mood as

---

[12] *See supra* n.7.

moderately depressed.  (Tr. 411.)  Dr. Serposs continued Plaintiff's medications without change.  (Tr. 412.)

Plaintiff was seen for a check of his intraocular pressure.  (Tr. 407, 409.)  Plaintiff reported that he felt his vision was declining.  (Tr. 407, 409.)  Plaintiff also reported that he did not mind using the eye drops, but did forget to use them one to two times per week.  (Tr. 407.)  Plaintiff's treatment providers remained concerned that Plaintiff's intraocular pressure "may still be too high" and discussed argon laser trabeculoplasty ("ALT"), which Plaintiff was willing to try.  (Tr. 409, 587.)

Around one month later, Plaintiff had follow-up appointments with Dr. Serposs and ophthalmology.  (Tr. 402-07.)  ALT was performed.  (Tr. 405, 583-85.)  Plaintiff's intraocular pressure decreased from 18 to 12 post-procedure.  (Tr. 404, 405, 407.) Plaintiff was directed to continue using his eye drops and return in four to six weeks.  (Tr. 405.)

During his appointment with Dr. Serposs, Plaintiff "report[ed] his mood to be fair at this time."  (Tr. 402.)  Plaintiff continued to look for work.  (Tr. 402.)  Dr. Serposs noted that Plaintiff "continues to experience some low back pain and is taking oxycodone for this which helps."  (Tr. 402.)  Plaintiff was again described as casually dressed, adequately groomed, and fully cooperative with normal speech, logical thinking, and an appropriate affect.  (Tr. 402.)  Dr. Serposs described Plaintiff's mood as mildly depressed.  (Tr. 402.)  Plaintiff was directed to continue with his current medications and return in one month.  (Tr. 403.)

A few days later, Plaintiff had a follow-up appointment in ophthalmology.  (Tr. 398.)  Plaintiff underwent additional ALT.  (Tr. 399, 577-79.)  His intraocular pressure was 15 both before and after the procedure.  (Tr. 399, 578-79.)

### C. 2011

Plaintiff's next appointment with Dr. Serposs was on January 24, 2011.  (Tr. 397.)  Plaintiff again "report[ed] his mood to be fair overall" and he continued to look for work.  (Tr. 397.)  Plaintiff reported that "[h]e is trying to keep busy with odd jobs and computer games but finds himself getting bored."  (Tr. 397.)  Dr. Serposs described Plaintiff's mood as mildly depressed.  (Tr. 397.)  No changes to Plaintiff's medications were made and Plaintiff was told to follow up in five weeks.  (Tr. 397.)

During his ophthalmology appointment the same day, Plaintiff reported a burning sensation and redness when using the Cosopt drops following ALT.  (Tr. 392, 394, 572-74.)  Plaintiff's intraocular pressure was 11, which was considered "acceptable."  (Tr. 392, 393, 396.)  Plaintiff was directed to return in six months.  (Tr. 393.)

Plaintiff met with Dr. Serposs again at the end of February.  (Tr. 390.)  Plaintiff was much the same as his previous two appointments.  He continued to look for regular employment while performing "some odd jobs here and there"; his mood remained fair; and Dr. Serposs described him as mildly depressed.  (Tr. 391.)  During this appointment, Plaintiff reported that "he is limited to what he can do owing to back problems."  (Tr. 391.)  No medication changes were made and Plaintiff was to follow up in one month.  (Tr. 391.)

In the beginning of March, Plaintiff saw Dr. Bassett for a medication change "from oxycodone-acetaminophen to plain oxycodone for his back pain." (Tr. 388; *accord* Tr. 570, 702.) Plaintiff reported chronic back pain, which he was treating with a back brace, back exercises, diclofenac, and oxycodone-acetaminophen. (Tr. 388, 570, 702.) Plaintiff reported that he recently aggravated his back when he slipped getting off a bus. (Tr. 388, 570, 702.) Plaintiff also reported that "[h]e has been relatively inactive and . . . could not help his landlord carry a . . . carpet upstairs due to pain." (Tr. 388; *accord* Tr. 570, 702.)

Upon examination, Dr. Bassett observed that Plaintiff walked "very stiffly" and was "wearing a substantial back brace." (Tr. 389; *accord* Tr. 571, 703.) Dr. Bassett described Plaintiff's spine flexion as follows: "Reaches only to above knees and lateral flexion similarly. Extension is 20 degrees." (Tr. 389; *accord* Tr. 571, 703.) Dr. Bassett additionally noted that Plaintiff's blood pressure was "adequately controlled." (Tr. 389; *accord* Tr. 570, 703.) Dr. Bassett diagnosed Plaintiff with chronic low back pain due to degenerative disk disease; changed Plaintiff's medication from oxycodone-acetaminophen to plain oxycodone; and directed Plaintiff to continue doing back exercises and wearing his back brace. (Tr. 389, 571, 703.) If Plaintiff's condition did not improve, Dr. Bassett noted that Plaintiff could resume physical therapy and/or consider a neurosurgery consultation. (Tr. 389, 571, 703.)

Between the end of March and mid-July, Plaintiff continued to meet with Dr. Serposs once per month. (Tr. 380, 383, 384, 385, 387; *accord* Tr. 560-68, 697-98, 699-700.) During these visits, Plaintiff generally described his mood as fair. (Tr. 381, 387,

697.)  Plaintiff continued to reach out to his son and ultimately heard back, which helped

lift Plaintiff's spirits.  (Tr. 381, 383, 384, 385, 563, 565, 700.)  Plaintiff talked positively

about his grandson and hoped to visit him soon.  (Tr. 381, 384, 387, 561, 568, 697.)

Plaintiff's daughter was experiencing some medical issues, which was upsetting to

Plaintiff.  (Tr. 385-86, 566.)  Plaintiff reported going to a movie with friends to celebrate

his birthday.  (Tr. 384, 565.)  Plaintiff remained without full-time employment, doubting

that he could work due to his back, but continued to perform jobs for his landlord.  (Tr.

381, 383, 387, 561, 563, 568, 697, 700.)  Plaintiff's back pain persisted, which he

continued to treat with oxycodone and a back brace.  (Tr. 384, 386, 387, 561, 563, 566,

568, 700.)

Plaintiff believed that his mental-health medications were helpful.  (Tr. 381, 561,

697.)  During these visits, Dr. Serposs observed that Plaintiff was casually dressed,

adequately groomed, and fully cooperative and had normal speech, logical thinking, and

an appropriate affect.  (Tr. 381, 383, 384, 387, 561, 565, 568, 697, 700.)  Plaintiff's

mood ranged from mildly depressed to depressed.  (Tr. 381, 383, 384, 387, 561, 563, 565,

568, 697, 700.)  Dr. Serposs continued Plaintiff's medications without change.  (Tr. 381,

384, 386, 387, 561, 563, 565, 697, 700.)

At the July appointment, Plaintiff also underwent a pain evaluation.  (Tr. 382-83,

698-99.)  Plaintiff described his pain as "sharp," and stated that it was "[c]onstant,

chronic."  (Tr. 382; *accord* Tr. 699.)  When asked for the location of his pain, Plaintiff

described it as "[g]eneralized joint pain."  (Tr. 382; *accord* Tr. 699.)  Weather made his

pain worse and medications helped alleviate it.  (Tr. 382, 699.)

In early August, Plaintiff had a six-month follow-up appointment with ophthalmology. (Tr. 376-80, 557-60, 694-96, 820-23.) Plaintiff reported that he had run out of the Travatan drops approximately one and one-half weeks ago. (Tr. 376, 379, 557, 694, 820.) Based on testing using the Humphrey Field Visual Analyzer ("HVF"), Plaintiff's right eye was "borderline overall" with "scattered defects, one dark black dot in [the] inferior nasal position but improved from the last test." (Tr. 377; *accord* Tr. 558, 695, 821.) Plaintiff's left eye was within normal limits overall "with scattered defects nasally" and "stable overall from last test." (Tr. 377; *accord* Tr. 559, 695, 821.) Plaintiff's intraocular pressure was described as "slightly high," but was thought to be due to the absence of the Travatan drops. (Tr. 377; *accord* Tr. 559, 695, 821.) Plaintiff was told to follow up in six months. (Tr. 378, 559, 695, 821.)

Plaintiff had monthly appointments with Dr. Serposs in August and September. (Tr. 374, 375; *accord* Tr. 554, 556, 691, 693, 818-20.) Plaintiff reported feeling much the same as his previous appointments. (Tr. 374, 375; *accord* Tr. 555, 556, 693, 818, 819.) Plaintiff continued to experience back pain. (Tr. 374, 375; *accord* Tr. 555, 556, 691, 693, 818, 819.) Plaintiff reported that the pain "was especially noticeable when he went to southern Minnesota with a friend and had to drive back." (Tr. 375; *accord* Tr. 556, 693, 819.) Plaintiff continued to have contact with his son and looked forward to seeing his grandson. (Tr. 375; *accord* 556, 693, 819.) Plaintiff described his mood as fair and reported that his mental-health medications were helpful. (Tr. 374, 375; *accord* Tr. 691, 693, 818, 819.) Plaintiff also mentioned possibly applying for Social Security benefits. (Tr. 374; *accord* Tr. 691, 818.) Dr. Serposs's observations were largely the

20

same as previous visits and he described Plaintiff as moderately depressed.  (Tr. 374, 375; *accord* Tr. 555, 556, 691, 693, 818, 819.)  There were no adjustments to Plaintiff's medications.  (Tr. 374, 375; *accord* Tr. 555, 556, 691, 693, 818, 819.)

At the end of September, Plaintiff had an annual exam with Dr. Bassett.  (Tr. 371, 549-54, 686-90, 811-17.)  Plaintiff complained of constipation, which Dr. Bassett attributed to the oxycodone.  (Tr. 371, 549, 686, 813.)  Plaintiff reported that he had cut back on using his CPAP machine "because of reflux during the night," and elevated the head of his bed instead.  (Tr. 371; *accord* Tr. 549, 686, 813.)  Plaintiff continued to experience chronic pain.  (Tr. 371, 549, 686, 813.)  Plaintiff also continued to perform odd jobs for his landlord and told Dr. Bassett that he was considering applying for Social Security benefits.  (Tr. 371, 550, 686, 814.)

Dr. Bassett noted that Plaintiff

> wakes up with stiffness in his hands and knees that lasts an hour.  He wears a brace on his right knee and a back brace though when he went down to help a friend load a motorcycle onto a truck, he did not even take his back brace and ended up driving back [two] hours.

(Tr. 371; *accord* Tr. 549, 686, 813.)  Dr. Bassett noted that Plaintiff does not drive much and his back had been bothering him more.  (Tr. 371, 549-50, 686, 813.)  Dr. Bassett noted that Plaintiff did "[v]ery little exercise" and, while Plaintiff had tried biking a short distance, this bothered his knees.  (Tr. 371; *accord* Tr. 550, 687, 814.)  Plaintiff's blood pressure was under control with medication and Plaintiff's cholesterol was under control without medication.  (Tr. 371, 550, 686, 813.)

Upon examination, Plaintiff was noted to be "an [o]bese man with depressed affect walking slowly, [and] groaning." (Tr. 372; *accord* Tr. 550, 687, 814.) Dr. Bassett continued Plaintiff's diclofenac and oxycodone prescriptions. (Tr. 372, 551, 687, 814.) Dr. Bassett noted that "[a]t some point[, Plaintiff] may request another knee brace for his left knee," which "[w]e will be glad to supply." (Tr. 372; *accord* Tr. 551, 687, 814.) Plaintiff was directed to continue using his back and right-knee braces. (Tr. 372, 551, 687, 814.) Dr. Bassett recommended weight loss, but noted that this would be difficult due to Plaintiff's "inability to exercise." (Tr. 372; *accord* Tr. 551, 687, 814.) Plaintiff was also directed to resume using his CPAP machine and given medications for constipation and acid reflux. (Tr. 372, 551, 687, 814.) Plaintiff's blood-pressure medication was continued as well. (Tr. 372, 551, 687, 814.)

Plaintiff had three more mental-health appointments before the end of the year. (Tr. 363, 366, 367; *accord* Tr. 544, 680, 803, 807, 808-11.) One of these appointments was with a nurse due to a scheduling conflict with Dr. Serposs. (Tr. 363, 366, 367; *accord* Tr. 544, 680, 808.) During the October appointment with the nurse, Plaintiff reported stress from difficulties his daughter was experiencing at home in New York and being frustrated that he was not able to help. (Tr. 367-68; *accord* Tr. 544, 681, 809.) Plaintiff's mood was "ok" and he had concerns regarding his memory. (Tr. 368; *accord* Tr. 544, 681, 809.) Plaintiff reported that he was assisting a friend's business "by doing some phone calling and says he gets easily distracted from the phone calls when he hears other things." (Tr. 368; *accord* Tr. 681, 809; *see* Tr. 544.) Plaintiff's sleep had improved since he began taking medication for acid reflux. (Tr. 368, 545, 681, 809.)

The nurse described Plaintiff as "[p]leasant, talkative, [and] engaged." (Tr. 369; *accord* Tr. 546, 683, 810.) Plaintiff's affect had full range and he had adequate insight and judgment. (Tr. 369, 546, 683, 810.) Plaintiff's speech and thought process were normal. (Tr. 369, 546, 683, 810.) The nurse noted that Plaintiff "[w]alk[ed] easily without assistive devices," but did "[g]et[] up slowly/stiffly after sitting for 30 min[utes]." (Tr. 369; *accord* Tr. 546, 682-83, 810.) The nurse noted that Plaintiff was "stable" on his current medications and instructed him to "monitor his memory and concentration issues and assess further with Dr. Serposs." (Tr. 369; *accord* Tr. 546, 683, 811.)

While Plaintiff continued to be stressed by his daughter's financial and home situation in November, (Tr. 366, 542-43, 679, 807), things had settled down somewhat by December, (Tr. 363, 539, 675-76, 804). In December, however, Plaintiff reported losing contact with his son, who no longer had a cell phone. (Tr. 363; *accord* Tr. 539, 676, 804.) Plaintiff's back pain remained, although medication helped. (Tr. 363, 366; *accord* Tr. 539, 543, 675, 679, 804, 807.) Plaintiff continued performing odd jobs for his landlord and doing phone sales. (Tr. 363, 366; *accord* Tr. 539, 543, 676, 679, 804, 807.) Dr. Serposs noted that Plaintiff "is limited in his ability to exercise and as a result weight is an issue[]." (Tr. 363; *accord* Tr. 539, 675, 804.) While describing Plaintiff as poorly groomed at the November appointment, Dr. Serposs described Plaintiff as adequately groomed at the December appointment. (Tr. 363, 366; *accord* Tr. 539, 543, 676, 679, 804, 807.) During each appointment, Dr. Serposs noted that Plaintiff was moderately depressed. (Tr. 363, 366; *accord* Tr. 539, 543, 676, 679, 804, 807.) Dr. Serposs

23

continued Plaintiff's medications at their current levels.  (Tr. 363; *accord* Tr. 543, 539, 676, 679, 804, 807.)

In connection with the December appointment, Plaintiff also had a pain evaluation.  (Tr. 364-65; *accord* Tr. 540-41, 677-78, 805-06.)  Plaintiff stated he had pain in his back and legs, which was "dull," "[c]onstant[, and] chronic."  (Tr. 364-65; *accord* Tr. 540, 677, 805.)   Plaintiff reported that quick changes in position aggravated his pain while medications helped alleviate his pain.  (Tr. 365; *accord* Tr. 540, 677, 805.)

### D. 2012

Between the end of January through April 2012, Plaintiff met with Dr. Serposs an additional three times.  (Tr. 359, 360, 362; *accord* Tr. 533-38, 669-74, 797-800, 802-03.) Plaintiff's appointments were generally about six weeks apart.  (Tr. 361, 362; *see* Tr. 359.)  Overall, Plaintiff reported little change.  (Tr. 359, 362, 533, 537, 669, 674, 798, 802.)   Plaintiff continued to report struggles with back pain and some relief from medication, although there were a few weeks where Plaintiff's depression worsened due to an increase in pain.  (Tr. 359, 360, 362; *accord* Tr. 533, 535, 537, 669, 671, 674, 798, 799, 802.)  Plaintiff described his mood as "fair" and, at one point, Dr. Serposs noted Plaintiff's mood was "reasonably positive and stable."  (Tr. 359, 362, 533, 537, 669, 674, 798, 802.)  Plaintiff was still performing odd jobs for his landlord now and again and had been able to see his son more.  (Tr. 359, 360, 361, 362, 533, 535, 537, 669, 671, 674, 798, 800, 802.)  During these visits, Dr. Serposs described Plaintiff as casually dressed and fully cooperative with normal speech, logical thinking, and an appropriate affect.  (Tr. 361, 362; *accord* Tr. 535, 537, 671, 674, 800, 802.)  Plaintiff presented with both poor

and adequate grooming, and his mood was observed to be between mildly and moderately depressed. (Tr. 361, 362, 535, 537, 671, 674, 800, 802.) No changes were made to Plaintiff's medications. (Tr. 359, 361, 362, 533, 535, 537, 669, 671, 674, 798, 800, 802.)

In early June, Plaintiff had a follow-up appointment with ophthalmology. (Tr. 354-59; *accord* Tr. 527-31, 663-68, 791-96.) Plaintiff reported using his eye drops "faithfully" and denied pain, irritation or discharge. (Tr. 354; *accord* Tr. 527, 664, 792.) Plaintiff did report, however, that his vision was "slowly worsening." (Tr. 354; *accord* Tr. 527, 664, 792.) Upon examination, Plaintiff's intraocular pressure was up again and Alphagan[13] was prescribed. (Tr. 355; *accord* Tr. 527-28, 664, 792.) The presence of Fuchs' dystrophy and mild cataracts were additionally noted. (Tr. 355; *accord* Tr. 528, 664, 793.) Plaintiff was described as "[d]oing well currently," and his condition should be monitored. (Tr. 355; *accord* Tr. 528, 664, 793.) Plaintiff was directed to return in five to six weeks. (Tr. 355; *accord* Tr. 528, 664, 592.)

Plaintiff also met with Dr. Serposs in early June. (Tr. 353; *accord* Tr. 525, 662, 790-91.) During this appointment, Plaintiff reported "some increased anxiety in relation to his glaucoma which is apparently worsening" and that additional eye drops had been prescribed the previous day. (Tr. 353; *accord* Tr. 525, 662, 790.) The situation Plaintiff's daughter was experiencing in New York had also deteriorated. (Tr. 353;

---

[13] Alphagan, a brand name for ophthalmic brimonidine, "is used to lower pressure in the eyes in patients who have glaucoma (high pressure in the eyes that may damage nerves and cause vision loss) and ocular hypertension (pressure in the eyes that is higher than normal but not high enough to cause vision loss)." *Brimonidine Ophthalmic*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601232.html (last visited on Jan. 9, 2017).

*accord* Tr. 525, 662, 790.)  Plaintiff was "trying to be supportive of her but there is little else he can do."  (Tr. 353; *accord* Tr. 525, 662, 790.)  Plaintiff's mood remained "fair overall" and Dr. Serposs described him as moderately depressed.  (Tr. 353; *accord* Tr. 525-26, 662, 790.)

Plaintiff met with Dr. Serposs again five weeks later.  (Tr. 352; *accord* Tr. 523, 660, 788-89.)  Plaintiff "report[ed] that he continues to struggle with back pain but does find oxycodone to be helpful."  (Tr. 352; *accord* Tr. 524, 660, 788.)  His mood remained "fair overall," and was "somewhat buoyed by the fact that he is going to [New York] by bus in a few weeks to see his daughter and her [two-year-old] son."  (Tr. 352; *accord* Tr. 524, 660, 788.)  Dr. Serposs continued Plaintiff's medications and directed him to return in five weeks.  (Tr. 352; *accord* Tr. 524, 660, 788.)

Approximately one week later, Plaintiff had a follow-up appointment with ophthalmology.  (Tr. 347; *accord* Tr. 521-23, 657-60, 786-88.)  Plaintiff denied pain, irritation, and discharge, and was "[p]retty good . . ." about using his eye drops.  (Tr. 347; *accord* Tr. 521, 657, 786.)  Repeat HVF testing showed that there was "possible progression" in his right eye when compared to the August 2011 results whereas his left eye showed improvement when compared to the same.  (Tr. 347; *accord* Tr. 521, 658, 786.)  Plaintiff's intraocular pressure was up again.  (Tr. 347; *accord* Tr. 522, 658, 786.)  Plaintiff was referred to "glaucoma service" to discuss future action.  (Tr. 348; *accord* Tr. 522, 658, 787.)

In mid-August, Plaintiff was seen by Dr. Serposs.  (Tr. 346; *accord* Tr. 519, 655-56, 784-85.)  During this visit, Plaintiff reported that he was not able to go to New York

26

because "they could not arrange transportation to pick him up in Rochester." (Tr. 346; *accord* Tr. 519, 655, 784.)  Plaintiff was "somewhat disappointed," but planned to go over Thanksgiving. (Tr. 346; *accord* Tr. 519, 655, 784.)  Plaintiff noted that he was scheduled to be seen at the University of Minnesota the following week regarding his eyes. (Tr. 346; *accord* Tr. 519, 655-56.)  Dr. Serposs noted that Plaintiff's "mood is fair and largely stable." (Tr. 346; *accord* Tr. 519, 656.)  Plaintiff reported that his mental-health medications were helpful and Dr. Serposs continued them at the same levels. (Tr. 346; *accord* Tr. 519, 656.)

Roughly one week later, Plaintiff was seen at the University of Minnesota for a glaucoma evaluation. (Tr. 492.)  The only note from this visit is a "rooming note" stating the purpose for Plaintiff's visit. (Tr. 492.)

Approximately one month later, Plaintiff saw Dr. Serposs again. (Tr. 514; *accord* Tr. 620, 650-52, 779-80.)  Plaintiff reported that he was feeling "more depressed as of late as his daughter in [New York] is struggling financially and he is unable to help her." (Tr. 514; *accord* Tr. 620, 651, 779.)  Plaintiff also continued to have pain in his back and both of his knees. (Tr. 514; *accord* Tr. 620, 651, 779.)  Plaintiff told Dr. Serposs about his recent visit to the University of Minnesota for glaucoma and stated that he "will be returning there on October 19 for a laser procedure." (Tr. 514; *accord* Tr. 620, 651, 779.)  Plaintiff's medications remained as previously prescribed. (Tr. 514; *accord* Tr. 620, 651, 779.)

At the beginning of October, Plaintiff had a follow-up appointment with Dr. Bassett. (Tr. 509-13; *accord* Tr. 614-19, 645-50, 773-78.)  Plaintiff's chief complaint

was ongoing low back pain.  (Tr. 510; *accord* Tr. 614, 646, 774.)  Plaintiff reported that sometimes taking four of his oxycodone pills per day was not enough, but he was able to supplement with acetaminophen and etodolac[14].  (Tr. 510; *accord* Tr. 614, 646, 775.)  Plaintiff stated that his pain "appear[ed] with lifting and other activities, but he can walk somewhat."  (Tr. 510; *accord* Tr. 614, 646, 775.)  Plaintiff's pain was at a 5 and "stable from last year."  (Tr. 510; *accord* Tr. 615, 647, 775.)  Upon examination, Plaintiff had lumbar paraspinous tenderness.  (Tr. 511; *accord* Tr. 615, 647, 775.)  Dr. Bassett continued Plaintiff's pain medications at their current levels.  (Tr. 511; *accord* Tr. 615, 647, 776.)  Dr. Bassett also recommended that Plaintiff go on a "weight reduction diet," but noted that Plaintiff was "[n]ot likely to be compliant."  (Tr. 511; *accord* Tr. 616, 647, 776.)  Plaintiff was directed to follow up in one year or as needed.  (Tr. 511; *accord* Tr. 616, 648, 776.)

## IV. DISABILITY REPORTS

As part of the disability application process, Plaintiff participated in a phone interview.  (Tr. 240-41.)  No difficulties hearing, reading, breathing, understanding, being coherent, concentrating, talking, or answering were observed.  (Tr. 241.)  Plaintiff was described as "cooperative."  (Tr. 241.)

A disability report was completed on Plaintiff's behalf.  (Tr. 244.)  The following conditions were listed as limiting Plaintiff's ability to work: ADHD, Fuchs' dystrophy,

---

[14] Etodolac is a nonsteroidal anti-inflammatory drug "used to relieve pain, tenderness, swelling, and stiffness." *Etodolac*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a692015 html (last visited on Jan. 9, 2017).

degenerative disk disease, glaucoma, cataracts, depression, back and knee problems, sleep apnea, and hypertension.  (Tr. 244.)

In September 2012, Plaintiff completed a function report.  (Tr. 252-59.)  When asked how his conditions limited his ability to work, Plaintiff responded:

> Some days it[']s hard to get out of bed, can't stay awake but can't sleep for any long periods of time.  Some days the back pain is so great that all I do is stay in bed.  I tried to find work but can't find any with these health problems, can't lift or bend like I used to[.]

(Tr. 252.)  Plaintiff also reported that his conditions affected his ability to sleep, noting that he "slept just a few hours, but several times a day."  (Tr. 253.)  When asked to describe his typical day, Plaintiff reported that he cooked breakfast, watched television, took a nap, ate lunch, and napped again.  (Tr. 253.)  Plaintiff stated that, if he was "not too tired," he would "try to do some laundry."  (Tr. 253.)  Plaintiff also reported using a cane as well as back and knee braces on a daily basis.  (Tr. 258.)

Plaintiff reported that he did not need help performing his own personal care, but did need help and reminders to take his medication.  (Tr. 253-54.)  Plaintiff reported that he used a calendar and daily pill boxes as reminders.  (Tr. 254.)  Plaintiff reported that he prepared his own meals, including sandwiches, frozen dinners, and some full meals.  (Tr. 254.)  Plaintiff indicated that he made full meals every couple of days and otherwise prepared meals once per day.  (Tr. 254.)  As for household chores, Plaintiff reported that he did laundry two or three times per month and performed light cleaning two times per week.  (Tr. 254.)  Plaintiff indicated that his landlord took care of the yardwork.  (Tr. 254.)

Plaintiff reported that he went outside approximately once per week. (Tr. 255.) Plaintiff traveled by car and public transportation. (Tr. 255.) Plaintiff noted, however, that while he "can still drive," he is not able to do so "for any long period of time." (Tr. 255.) Plaintiff reported that he went grocery shopping for one to two hours in stores. (Tr. 255.) When asked about his hobbies, Plaintiff stated that he enjoyed watching television and checking e-mail, both of which he did daily. (Tr. 256.) Although Plaintiff reported that he watched more television now since the onset of his conditions, he noted that he "nap[s] a lot during it." (Tr. 256.)

As for Plaintiff's social activities, he indicated that he spent time talking to his daughter on the phone and visiting with his neighbor. (Tr. 256.) Plaintiff stated "none" when asked if there were any places that he went on a regular basis. (Tr. 256.) Plaintiff also reported that he needed to be reminded to go places. (Tr. 256.) Plaintiff additionally reported that he sometimes has difficulty getting along with family, friends, and neighbors by "get[ting] upset or angry real quickly." (Tr. 257.) When asked to describe changes in his social activities since the onset of his conditions, Plaintiff stated that he no longer "do[es] too many activities." (Tr. 257.)

Plaintiff reported that his conditions affect his ability to lift, squat, bend, reach, walk, kneel, climb stairs, concentrate, and get along with others. (Tr. 257.) When asked to explain how his conditions affected each of these things, Plaintiff wrote: "only lift about 5-10 lbs; can't get up if I could squat without help; only can bend so far; can only walk a block or so without a break, stairs take too much out of me. Sometimes I forget

what day it is or what I was doing."  (Tr. 257.)  Plaintiff reported that he can walk between 1 and 2 blocks before needing to rest for 10 to 20 minutes.  (Tr. 257.)

Plaintiff reported that he can usually pay attention for 10 to 15 minutes and "sometimes longer."  (Tr. 257.)  Plaintiff stated that he finishes what he starts.  (Tr. 257.) Plaintiff described his ability to follow both written and spoken instructions as "fine," but, with spoken instructions, Plaintiff needed to "start right away" and sometimes needed reminders.  (Tr. 257.)  Plaintiff reported that his ability to get along with authority figures is "okay for the most part[,] but some days [he] just need[s] to stay away from them."  (Tr. 258.)  As for his ability to handle stress, Plaintiff stated "not too well any more [sic]."  (Tr. 258.)  With changes in routine, Plaintiff reported that it is "hard to get started again."  (Tr. 258.)  Plaintiff also reported that he was experiencing unusual crying and feelings of guilt.  (Tr. 258.)

As part of his appeal of the denial of DIB, another disability report was completed for Plaintiff.  (Tr. 281-87.)  When asked if there had been any change in his conditions since Plaintiff's last report, the answer was "[n]o."  (Tr. 281.)  Likewise, Plaintiff had no new physical or mental limitations or new conditions since his last report.  (Tr. 281.)  In response to a question about how Plaintiff's conditions affect his ability to care for his personal needs, the following was written, in relevant part:

> I have problems taking care of my personal needs.  I have problems tying my shoes.  It is painful and takes me a long time until I can get it done.  I only wear sweatpants or pajama pants unless I have to go somewhere. I shower only 1-3 times a week because it is too painful to stand in the shower and sometimes the depression is just too great to have the

31

> motivation to do it.  I am constantly readjusting my
> position—laying down is the most comfortable for me.

(Tr. 285.)  When asked about changes in Plaintiff's daily activities since his last disability

report, it was reported that Plaintiff felt more tired and was taking more naps during the

day.  (Tr. 285.)

## V. MEDICAL OPINIONS

### A.  Dr. Serposs in 2010

In mid-April 2010, Dr. Serposs completed a request-for-medical-opinion form

from the Hennepin County Human Services Department.  (Tr. 334-35.)  Dr. Serposs

reported that he had most recently seen Plaintiff at the beginning of April and Plaintiff's

diagnosis was major depressive disorder.  (Tr. 334.)  Although indicating that Plaintiff's

condition would last for more than 30 days, Dr. Serposs left blank those portions of the

opinion form regarding any temporary or permanent physical or mental limitations.  (Tr.

334.)  Dr. Serposs indicated that Plaintiff had a treatment plan and was compliant.  (Tr.

334.)   When asked if Plaintiff would be able to perform any employment in the

foreseeable future, Dr. Serposs checked the box indicating that Plaintiff would not be

able to do so.  (Tr. 334.)

### B.  Dr. Karayusuf

On January 18, 2013, Alford Karayusuf, M.D., completed a consultative

examination.  (Tr. 625-26.)  Dr. Karayusuf noted that he "did not have any medical

reports available for [his] review."  (Tr. 625.)  Plaintiff's chief complaints were back and

knee problems as well as depression.  (Tr. 625.)  Dr. Karayusuf noted that Plaintiff was
casually dressed and casually groomed.  (Tr. 625.)

Plaintiff reported that bupropion and citalopram "have been helpful."  (Tr. 625.)
Plaintiff reported difficulties sleeping ("waking up every 2-3 hours throughout the
night"), appetite fluctuations, anxiety, racing thoughts, and worrying.  (Tr. 625.)  In
particular, Plaintiff reported worrying about his daughter and grandchild in New York.
(Tr. 625.)  Plaintiff also reported that his "[c]oncentration and memory are a bit
diminished."  (Tr. 625.)

Plaintiff reported that he gets up around 9:00 a.m. and goes to bed between 10:00
and 11:00 p.m.  (Tr. 625.)  Plaintiff stated that he bathed once per week.  (Tr. 625.)
Plaintiff cooked for himself, going to the grocery store every ten days.  (Tr. 625.)
Plaintiff washed dishes every day; did laundry every three days, "sometimes every three
weeks"; and cleaned once or twice per month.  (Tr. 625.)  Plaintiff rode the bus when he
needed to get around.  (Tr. 625.)

Plaintiff stated that he played online games "occasionally" and went to see a
movie once a week with a friend.  (Tr. 625.)  Plaintiff reported that "[h]e is able to
concentrate on the movies."  (Tr. 625.)  Plaintiff also reported that he spends time online
reading and "has some difficulty concentrating on that."  (Tr. 626.)  Plaintiff kept in
touch with a couple of friends once or twice per week by telephone and talked frequently
with his daughter by telephone.  (Tr. 626.)  Plaintiff stated that he did not have any
hobbies.  (Tr. 626.)

Dr. Karayusuf observed that Plaintiff

33

> was oriented to time, place, and person.  Immediate digit
> recall was good.  He recalled seven digits forward and four
> digits backward.  He recalled the names of two out of the last
> five presidents of the United States accurately and in mixed
> order.  He subtracted serial-7's accurately and with average
> speed.  He recalled three out of three unrelated objects after
> five minutes.

(Tr. 626.)  Plaintiff's recent and remote memory were intact.  (Tr. 626.)  Dr. Karayusuf

described Plaintiff's intelligence as "average" and his insight as "fair."  (Tr. 626.)

Dr. Karayusuf further noted that Plaintiff

> related in a slightly anxious, subdued, polite, friendly manner.
> He was spontaneous and provided information without being
> asked.  He was cooperative and answered all questions asked.
> He was not restless.  He showed no psychomotor agitation
> and no psychomotor retardation, showed no vigilance in
> scanning.  Tension was mild-to-moderate.  Eye contact was
> good.  Speech was coherent, relevant with no neologisms, no
> pressure, no flight of ideas.  Facies were a bit subdued.  He
> was not tearful.  Mood looked mildly depressed.  Affect was
> appropriate.  He had no loosening of associations.

(Tr. 626.)

Dr. Karayusuf diagnosed Plaintiff with "[m]ajor depression, recurrent, mild in

degree in partial remission."  (Tr. 626.)  Dr. Karayusuf concluded that Plaintiff "is able to

understand, retain and follow simple instructions.   He is restricted to superficial

interactions with fellow workers, supervisors and the public.  Within these parameters

and in the context of performing repetitive tasks, he is able to maintain pace and

persistence."  (Tr. 626.)

### C.  Dr. Johnson

A. Neil Johnson, M.D., conducted a consultative examination on March 6, 2013. (Tr. 718-21.)  Included among Plaintiff's chief complaints were high blood pressure, depression, glaucoma, cataracts, and back and left-knee pain.  (Tr. 718.)  Plaintiff reported a history of obstructive sleep apnea and use of a CPAP machine for over five years.  (Tr. 718.)  Dr. Johnson noted that Plaintiff was obese.  (Tr. 718.)

Plaintiff "report[ed] a history of glaucoma and cataract."  (Tr. 718.)  Plaintiff relayed that "the cataract is slight in the right eye" and described various treatments he had undergone for glaucoma, including eye drops and "cold laser treatment."  (Tr. 717.)  Plaintiff reported that he was scheduled for surgery related to his glaucoma in March 2013.  (Tr. 718.)  Plaintiff was able to read the paper and drive, although his "night vision sometimes is bothersome."  (Tr. 718; *see* Tr. 721.)

Plaintiff reported that he has had depression since 2003 and back pain since 1980. (Tr. 718.)  Plaintiff stated that, following an x-ray, he had been "told there is degenerative dis[k] disease from the thoracic to lumbar spine."  (Tr. 718.)  Additionally, Plaintiff stated that an "x-ray of . . . [his] left knee showed 'a deteriorating dis[k].'"  (Tr. 718.)  Dr. Johnson noted:

> He describes discomfort at his back with medication as 4-6 out of 10 and knees 7-8 out of 10.  He has never had surgery on his back or knee.  He does bring a cane which he uses sometimes particularly on icy surfaces.  On a good day he can walk three blocks, stand 10-20 minutes, sit 20-25 minutes. He can lift a 15 pound turkey but would be painful.  He can do stairs, would not do a high ladder.  He would have to hold on to squat and [it] is very difficult.  He does have trouble

> sleeping.  He is up a lot at night due to the fact that he takes a
> water pill and has pain.

(Tr. 718; *see* Tr. 720.)

Upon examination, Plaintiff was "pleasant," "cooperative," and "loquacious."  (Tr.

719; *see* Tr. 721.)  Dr. Johnson noted that "[h]istory has to be directed."  (Tr. 719.)  Dr.

Johnson additionally noted:

> The patient can hear conversational speech without limitation.
> Speech is clear.  The patient gets about slowly and with a lot
> of pain.  He demonstrates significant pain syndrome.  It was
> painful getting out of the chair.  When he walks he goes very
> slowly with small step[s].  He had severe difficulty getting on
> and off the exam table, severe difficulty tandem walking,
> severe difficulty squatting could do so half way and had to
> hold the table.  He could walk without his cane.  The patient
> is right handed and wearing glasses. . . . He is obese.

(Tr. 719; *see* 720.)   With respect to Plaintiff's glaucoma, Dr. Johnson stated that Plaintiff

reads the newspaper and "can drive although night vision can be a problem."  (Tr. 721.)

Dr. Johnson further noted that Plaintiff had full use of his hands, "moderate

crepitus [in the] left knee," and "mild crepitus [in the] right knee."  (Tr. 719; *see* Tr. 721.)

There was possible "mild instability of the left knee" as well as "tenderness over the

thoracic and lumbar spine."  (Tr. 719.)   Flexion of the "dorsolumbar" spine was 45

degrees and extension was 15 degrees.  (Tr. 720.)  Right and left lateral flexion were both

25 degrees and right and left rotation were both 30 degrees.  (Tr. 720.)  With respect to

Plaintiff's knees, he had 140 degrees of flexion in the right and 125 degrees of flexion in

the left.  (Tr. 720.)  Plaintiff's motor strength was 5/5, sensory function intact, and

reflexes symmetrical.  (Tr. 720.)  Dr. Johnson additionally noted that "[p]ain is a limiting factor" and Plaintiff's weight is an aggravating factor.  (Tr. 721.)

### D.  Dr. Serposs in 2014

Dr. Serposs completed a medical source statement in February 2014.  (Tr. 826-34.) Dr. Serposs stated that he had seen Plaintiff on a monthly basis since 2005 for medication management and psychotherapy.  (Tr. 826.)  Dr. Serposs listed Plaintiff's diagnoses as major depression and ADHD.  (Tr. 826.)  When asked to identify Plaintiff's signs and symptoms, Dr. Serposs checked poor memory, sleep disturbance, mood disturbance, emotional lability, difficulty thinking or concentrating, and suicidal ideation or attempts. (Tr. 826.)  Dr. Serposs indicated that Plaintiff "has been followed for several years" for these complaints and mental-status examinations "consistently demonstrate depressed mood [and] poor attention/concentration."  (Tr. 826.)

When asked about Plaintiff's ability to work full-time, Dr. Serposs indicated that Plaintiff's symptoms would "likely be severe enough to interfere with *attention and concentration* needed to perform even simple work tasks" 25% or more of the workday and Plaintiff was likely to be absent from work four or more days per month as a result of his impairments and treatment.  (Tr. 827.)  Dr. Serposs was then asked a series of questions regarding Plaintiff's ability to perform basic mental activities of work on a regular and continuing basis.  Dr. Serposs checked "yes" when asked whether Plaintiff's ability to understand, remember, and carry out instructions was affected by his impairments.  (Tr. 827.)  Dr. Serposs indicated that Plaintiff had a marked loss in his abilities to remember locations and work-like procedures, understand and remember very

37

simple instructions, carry out simple instructions, understand and remember complex instructions, maintain regular attendance and be punctual, work in coordination with or in close proximity to others without distraction, and make simple, work-related decisions. (Tr. 827-28.)  Plaintiff had an extreme loss in his abilities to maintain attention and concentration for extended periods, sustain an ordinary routine without special instructions, deal with the stress of semi-skilled and skilled work, perform at a consistent pace without unreasonable breaks, and complete a normal workday or workweek without interruption.  (Tr. 828.)  When asked to identify the factors that supported his assessment, Dr. Serposs wrote, "Depressed mood, inattention."  (Tr. 828.)

Next, Dr. Serposs was asked a series of questions related to Plaintiff's ability to interact with supervisors, coworkers, and work pressures.  (Tr. 828.)  Dr. Serposs checked "yes" when asked if Plaintiff's ability to respond appropriately to supervision, coworkers, and pressures in a work setting was affected by his impairments.  (Tr. 828.)  Dr. Serposs indicated that Plaintiff had a marked loss in his abilities to interact appropriately with the public, ask simple questions or request assistance, accept instruction and respond appropriately to criticism from supervisors, get along with coworkers and peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, respond appropriately to changes in routine, and be aware of normal hazards and take appropriate precautions.  (Tr. 828.)

Dr. Serposs further indicated that Plaintiff had marked restriction of activities of daily living; marked difficulties in maintaining social functions; frequent deficiencies in

38

concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in a work or work-like setting.  (Tr. 828-29.)  When asked how many episodes of decompensation Plaintiff had experienced in the last 12 months, Dr. Serposs indicated that Plaintiff had experienced more than 10 episodes.  (Tr. 829.)  Dr. Serposs indicated that Plaintiff's condition had existed in the manner described since 2002.  (Tr. 829.)

The medical-source-statement form also contained the mental disorders under listing 12.00 along with the respective A, B, and C criteria.  (Tr. 830-34.)  Under listing 12.04, which governs affective disorders, Dr. Serposs indicated that Plaintiff had a depressive syndrome characterized by anhedonia or pervasive loss of interest in all activities, appetite disturbance with weight gain, sleep disturbance, psychomotor agitation/retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking for the A criteria.  (Tr. 832.)  Dr. Serposs then indicated that these symptoms resulted in: marked restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration, for the B criteria.  (Tr. 832.)  Lastly, Dr. Serposs opined that the C criteria was met through a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation in the ability to do basic work activities, with symptoms or signs currently managed by medication or psychosocial support, and the existence of "[a] residual disease process that has resulted in such

marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [Plaintiff] to decompensate."  (Tr. 832.)

Towards the end of June, Dr. Serposs submitted a letter on Plaintiff's behalf, which states in total: Plaintiff "has been under my care for his Major Depressive Disorder since 2005.  In my medical opinion his disabling symptoms and limitations have been persistent since that time."  (Tr. 961.)

## VI. DISABILITY DETERMINATIONS

During the initial DIB determination, Plaintiff was found to have the severe impairments of a back disorder, osteoarthrosis, glaucoma, and an affective disorder.  (Tr. 74.)  Bruce Goldsmith, Ph.D., determined that Plaintiff had a medically determinable impairment that did "not precisely satisfy the diagnostic criteria" for affective disorders.  (Tr. 74.)  Goldsmith determined that there was insufficient evidence to determine any restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; and whether there had been repeated episodes of decompensation, each of extended duration.  (Tr. 74-75.)  In performing the psychiatric review technique, Goldsmith further noted that the "[e]vidence is insufficient prior to [date last insured]."  (Tr. 75.)

Charles T. Grant, M.D., assessed Plaintiff's physical residual functional capacity as of the date last insured and opined that Plaintiff had the following exertional limitations.  (Tr. 75-76.)  Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, and was otherwise unlimited in his ability to push and/or pull.  (Tr. 76.)  Plaintiff was able to both sit and stand with normal breaks for

approximately six hours in an eight-hour workday.  (Tr. 76.)  Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 76.)  With this physical residual functional capacity, Plaintiff was determined not to be able to perform his past relevant work, but capable of performing other work and was determined not to be disabled.  (Tr. 78-79; *see* Tr. 95.)

On reconsideration, Plaintiff was determined to have the same severe impairments. (Tr. 102.)  Mary X. Sullivan, Ph.D., similarly concluded that Plaintiff had a medically determinable impairment that did not satisfy the criteria for affective disorders as of the date last insured.  (Tr. 102-03.)  Sullivan found that Plaintiff had mild restrictions in his activities of daily living, mild difficulties in social functioning, and mild difficulties maintaining concentration, persistence or pace.  (Tr. 103.)  Sullivan answered "[n]one" when asked if Plaintiff had experienced repeated episodes of decompensation, each lasting an extended duration.  (Tr. 103, 104.)

Sullivan noted that Plaintiff had been followed "since 2004" for depressive disorder and ADHD, both of which were non-severe diagnoses.  (Tr. 103.)  Sullivan also pointed to notes describing Plaintiff as articulate, intelligent, well-connected to his providers, and trying to maintain relationships with his children.  (Tr. 103.)  Sullivan noted that there were no psychiatric hospitalizations or suicidal thoughts or attempts for several years.  (Tr. 103.)  Sullivan concluded that "these notes indicate that [Plaintiff] has not more than a non-severe mental impairment prior to [date last insured]."[15]  (Tr. 103.)

---

[15] Sullivan performed two assessments using the psychiatric review technique, one for the date last insured and one described as the "[c]urrent [e]valuation."  (Tr. 102, 103.)  Sullivan assessed Plaintiff's mental residual functional capacity only for the "[c]urrent [e]valuation."  Sullivan opined that Plaintiff had no understanding or memory

41

With respect to Plaintiff's physical residual functional capacity for the date last insured, Gregory Salmi, M.D., agreed with the findings of Dr. Grant.[16]   (*Compare* Tr. 76 *with* Tr. 105.)

While Plaintiff was determined to have past relevant work, he was not able to perform such work based on his residual functional capacity.   (Tr. 111.)   It was determined, however, that Plaintiff was able to perform medium work and therefore not disabled. (Tr. 111-12.)   The prior determination was affirmed.   (Tr. 130.)

---

limitations. (Tr. 108.) Sullivan opined that Plaintiff was not significantly limited in his ability to carry out very short and simple instructions, but moderately limited in his ability to carry out detailed instructions. (Tr. 108.) Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods of time. (Tr. 108.) Sullivan opined that Plaintiff was not significantly limited in his ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "sustain an ordinary routine without special supervision"; "work in coordination with or in proximity to others without being distracted by them"; and "make work-related decisions." (Tr. 108.) Sullivan also opined that Plaintiff was moderately limited in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 108.) Sullivan further opined that Plaintiff "is limited to simple to moderately complex tasks that are not fast paced or have unusual production demands." (Tr. 108.)

Sullivan also opined that Plaintiff had limitations on his ability to interact socially. (Tr. 108.) Sullivan opined that Plaintiff was not significantly limited in his abilities to ask simple questions, request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Tr. 108.) Plaintiff was, however, moderately limited in his abilities to interact appropriately with the public, accept instructions, respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 108.) Sullivan opined that Plaintiff was "limited to occasional and superficial contact." (Tr. 105.)

In addition, Sullivan opined that Plaintiff also had adaptation limitations. (Tr. 109.) Plaintiff was moderately limited in his "ability to respond appropriately to changes in the work setting." (Tr. 109.) Plaintiff was not significantly limited in his ability to be aware of hazards and take appropriate precautions, travel, use public transportation, set realistic goals, and make plans independently of others. (Tr. 109.) Sullivan opined that Plaintiff "is limited to routine tasks with infrequent changes." (Tr. 109.)

[16] Dr. Salmi made two physical residual-functional-capacity assessments. (Tr. 105-06.) The first was for the date last insured and the second was described as the "[c]urrent [e]valuation." (Tr. 105.) The second contained greater exertional, postural, and environmental limitations than the first. For this second residual-functional-capacity assessment, Dr. Salmi determined that Plaintiff was able to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and otherwise unlimited in his ability to push and/or pull. (Tr. 106.) Plaintiff could stand or walk with normal breaks for four hours in an eight-hour workday and sit for approximately six hours in an eight-hour workday. (Tr. 106.) Dr. Salmi opined that Plaintiff should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stop, kneel, crouch, and crawl. (Tr. 106.) As for the environmental limitations, Dr. Salmi opined that Plaintiff should avoid even moderate exposure to hazards, but was otherwise unlimited. (Tr. 107.) Plaintiff continued to have no manipulative, visual, or communicative limitations. (Tr. 106.)

# VII. ALJ PROCEEDINGS

## A.  Hearing Testimony

When asked at the hearing how Plaintiff's depression affected him, Plaintiff testified that there are some days that he does not want to get out of bed and times where he will start to do something, decide that he does not need to finish it right now, and then complete it later.  (Tr. 36.)  Plaintiff estimated that he currently has three to five days per month where he does not feel like doing anything.  (Tr. 37, 52.)  On those days, Plaintiff testified that he gets up, does "a little cooking," and goes back to bed.  (Tr. 37.)  Plaintiff will then watch some television and afterwards lay back down.  (Tr. 37.)  Plaintiff testified that he was currently taking bupropion and citalopram.  (Tr. 43.)  Plaintiff testified that the bupropion was also prescribed to address his ADHD.  (Tr. 44, 48.)  Plaintiff testified that his ADHD causes him to forget things mid-task and affects his ability to deal with other people, causing him to become abrupt and angry and talk down to others.  (Tr. 48.)  Plaintiff estimated that he had difficulty dealing with others between two and three times per month  (Tr. 49.)  Plaintiff also testified that he wakes up at night every two or three hours due to pain or discomfort, and it typically takes another hour for Plaintiff to fall back asleep.  (Tr. 48; *see* Tr. 56.)

Plaintiff testified that he can sit for "a limited period of time," approximately 20 to 30 minutes, "depending on the chair."  (Tr. 37.)  Plaintiff explained that back pain and discomfort limited his ability to sit.  (Tr. 45.)  Plaintiff testified that he is on two different pain medications.  (Tr. 45.)  Plaintiff testified that he can lie down for one or two hours before he needs to get up and move.  (Tr. 37.)  Plaintiff testified that he can stand for 20

to 25 minutes with a cane, but only 10 minutes without it.  (Tr. 37.)  Plaintiff testified that

he uses a cane every day.  (Tr. 37.)  Plaintiff also attributed the limitations on his ability

to stand to his back and knees.  (Tr. 45.)  When asked about his ability to walk, Plaintiff

testified that he could walk three to four blocks before he got tired.  (Tr. 38.)  Plaintiff

estimated that it would take him about 30 minutes to walk this distance.  (Tr. 38.)

Plaintiff explained that for longer distances like this, he depends on his cane because his

left knee gives out.  (Tr. 38.)  Plaintiff testified that he began using the cane occasionally

in 2009 and, since early 2011, used it constantly.  (Tr. 38.)  Plaintiff testified that the cane

was not prescribed, just the back and knee braces.  (Tr. 38.)  One of Plaintiff's taxi

patrons, however, had left a cane in the cab and Plaintiff just started using it.  (Tr. 38.)

Plaintiff also stated that his back affects his ability to walk.  (Tr. 46.)

      With respect to his knee braces, Plaintiff testified that he received the right knee

brace in 2009 due to pain, popping, and dragging.  (Tr. 39.)  Plaintiff testified that he

experienced problems with his right knee every day and sometimes two or three times per

day.  (Tr. 39.)  Plaintiff testified that he currently uses his right-knee brace once a week to

combat popping.  (Tr. 40.)  Plaintiff testified that he started using the left knee brace in

2011 to prevent his knee from giving out.  (Tr. 40.)

      With respect to his back brace, Plaintiff testified that the brace was prescribed in

2009 for lower back pain and degenerative disk disease.  (Tr. 41.)  Plaintiff testified that,

when the brace was first prescribed, he used it every day.  (Tr. 41.)  Plaintiff testified that

he currently used the back brace two or three times per week, primarily for situations

when he is away from his home and where he is not lying down a regular basis.  (Tr. 41.)

Plaintiff testified that he does not use the back brace when he is at home because he can just lay down. (Tr. 41.) Plaintiff testified that he is most comfortable laying down, a position he can maintain for one to two hours. (Tr. 42.) Plaintiff testified that he tried to continue performing exercises he had previously learned in physical therapy in order to manage his back pain, but it is "becoming harder and harder to do them." (Tr. 44.)

Plaintiff was subsequently asked how his current abilities compared to his abilities in 2009. Plaintiff testified that, in 2009, he could sit between 30 and 45 minutes with his back brace. (Tr. 42.) Plaintiff testified that, with his back and knee braces, he could probably stand for up to an hour in 2009. (Tr. 42.) As for walking, Plaintiff estimated that he could walk for two hours or so with his back and knee braces. (Tr. 42.) Plaintiff testified that, in 2009, it would take him approximately 15 minutes to walk three to four blocks. (Tr. 43.)

Due to his Fuchs' dystrophy, Plaintiff testified that his vision will become increasingly worse. (Tr. 46.) Plaintiff testified that he had undergone a number of different treatments for glaucoma and a slight cataract, and ultimately underwent surgery. (Tr. 46.) Plaintiff testified that it is more difficult to drive and walk at night following the surgery. (Tr. 46; see Tr. 47.) Plaintiff also testified that it is hard to focus. (Tr. 47.)

 On good days, Plaintiff testified that he gets up, makes breakfast, takes a little break so that he can do the dishes, watches television, makes lunch, does some laundry, makes dinner, watches more television, and checks his e-mail. (Tr. 53; see Tr. 54.) Plaintiff testified that he connected his computer to his television, which made the text bigger and easier to read. (Tr. 56.) Plaintiff testified that he makes microwave dinners

and box meals for himself, but has a hard time with baking mixes because the stirring causes problems with his back.  (Tr. 53.)  Plaintiff also testified that he does light housework.  (Tr. 53; *see* Tr. 54-55.)

Plaintiff testified that he used to work as a taxi driver, "renting the car . . . 24 [sic] hours . . . a week."  (Tr. 49.)  Plaintiff would start and stop throughout the day, working 7:00 a.m. to 12:00 p.m., then 4:00 to 6:00 p.m., and finally from 11:00 p.m. to 3:00 a.m."  (Tr. 49.)  Plaintiff testified that he did this "[s]ix" days per week on average.  (Tr. 49.)  Plaintiff testified that he would not be able to work the same schedule because he would not "be able to sit in the car."  (Tr. 49.)  Plaintiff testified that sitting or driving for long periods of time causes back and knee pain.  (Tr. 50.)

Plaintiff also discussed another job he had as a call-center representative.  (Tr. 50.)  Plaintiff primarily sat for this position, but, with his headset, was able to get up and walk a short distance "to the cube next to [him] on either side."  (Tr. 51.)  Plaintiff testified that he "probably" could still perform this job if he "had a 40 foot headset" so he could walk away from his computer and stretch his knees and back.  (Tr. 51.)  Plaintiff testified that he did not have issues dealing with customers, but "the loudness, the abruptness of the people working next to [him]" would set him off.  (Tr. 52.)

During the hearing, several hypotheticals were posed to the vocational expert.  The first three were posed by the ALJ.  The hypotheticals were as follows:

> Hypothetical one is a person limited to medium work, provided that working with supervisors, coworkers and the public is greater than at least frequently or frequently in exertion, which means one third to two thirds of the work day and in non-exertions it takes only sedentary to me—at least

frequent.  It takes on sedentary, meaning what we used to call moderate limitations.  Also rated at least frequently would be maintaining attention, concentration for extended periods, and understanding, remembering, and carrying out and dealing with complex instructions, working at a production rate pace and adapting to changes in routine work settings.  From the cumulative effect of those limitations in concentration, persistence, and pace, he would be off task about [two] percent of the work day.

. . .

Hypothetical two.  He's limited to light work, provided standing and walking is only four hours out of a day.  He'd be sitting up to six total.  Now [sic] climbing of ladders, ropes, and scaffolds.  The other posturals are limited to occasional only, which of course leads up to one third of the work day.  And avoiding even moderate exposure to unprotected heights and [INAUDIBLE] [sic] regular products.  Would a person with those limitations—well, let me back up.  The hypothetical two would include the non-exertional limitations as contained in hypothetical one as well.

. . .

Hypothetical three is the same as hypothetical two, except we're going to [INAUDIBLE] [sic] up these restrictions, only, the non-exertions.  All three areas of socialization and handle [sic] greater than at least occasional instead of frequently, where the—where occasionally and I think non-exertionals take on secondary meaning of what we used to call work limitations.  And sustaining an ordinary routine without special supervision would be rated extreme, which means there's a major limitation in this area with no useful ability to function effectively.  Also extreme in maintaining attention, concentration, for extended periods and responding appropriately to work pressures or skilled, semi skilled work.  And greater than at least occasional, would be also remembering work[-]like procedures and locations, asking simple questions or questioning assistance.  Understand[ing], remembering, and carrying out instructions at all levels, working at production rate pace, major judgments on simple decisions, adhering to standards of neatness and cleanliness,

and adapting to change in routine work settings with a
cumulative effect—would be off task at least 25 percent of
the work day, plus the individual's going to miss three or
more days of work per month or he's not there at all.

(Tr. 58-61.)  The vocational expert testified that the hypothetical individual in the first

two hypotheticals was capable of performing at least one of the jobs in Plaintiff's past

relevant work, but hypothetical three would eliminate all work.  (Tr. 58-60.)

Plaintiff's then-counsel posed variants of these hypotheticals to the vocational

expert.    (Tr. 61-63.)    There was some confusion regarding the intersections and

distinctions between then-counsel's hypotheticals and the ALJ's hypotheticals among

counsel, the ALJ, and the vocational expert, with the vocational expert stating, at one

point, "I'm totally lost in all of this, [J]udge.  I'm not tracking."  (Tr. 65.)  Both the ALJ

and Plaintiff's then-counsel subsequently posed additional hypotheticals to the vocational

expert.  (Tr. 63-67.)

## B.  ALJ'S Decision

The ALJ found that Plaintiff last met the insured status requirements on June 30,

2010, and had not engaged in substantial gainful activity from his alleged onset of May

28, 2009, through the date last insured.  (Tr. 15.)  The ALJ found and concluded that

Plaintiff had the severe impairments of degenerative disk disease, hypertension,

glaucoma, obstructive sleep apnea, obesity, and depression, and none of Plaintiff's

impairments when considered individually or in combination met or equaled listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 16-18.)  Specifically, the

ALJ found that, with respect to listing 12.04, Plaintiff had mild restriction in his activities

of daily living and moderate difficulties in social functioning and his ability to maintain concentration, persistence, or pace. (Tr. 16.) The ALJ found that there had been no episodes of decompensation of extended duration, noting that Plaintiff had "not been psychiatrically hospitalized since [2003]" and therefore this hospitalization was not an episode of decompensation of extended duration within the relevant period. (Tr. 16.)

The ALJ found that Plaintiff had the residual functional capacity to perform medium work, except that Plaintiff

> can at least frequently accept instruction and criticism from supervisors and interact with co-workers and the public without distracting them or exhibiting behavior extremes. He can at least frequently maintain attention and concentration for extended periods, understand, remember and carry out detailed and complex instructions, work at a production rate pace, be punctual, take usual breaks, and adapt to change in the routine work setting. Because of these limitations on [Plaintiff's] concentration, persistence and pace, he is expected to be off task for two percent . . . of the workday due to distractibility.

(Tr. 17.)

While the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely credible." (Tr. 18.) First focusing on Plaintiff's activities, including his ability to tend to his own personal cares, cook meals, do laundry, perform light cleaning, drive, go out shopping alone, and use a computer to communicate with others, the ALJ found that "[t]his level of independent function is inconsistent with a finding of disability." (Tr. 18.) The ALJ also observed that Plaintiff "did not exhibit any

obvious pain behavior and appeared to sit comfortable" during the hearing.  (Tr. 18.)

Also, Plaintiff's answers were vague regarding his actual limitations. (Tr. 18.)  The ALJ

additionally pointed to a trip Plaintiff took to New York in May 2014 to help his daughter

move.  (Tr. 18.)  Thus, notwithstanding "the complicating factor of [Plaintiff's] obesity,"

the ALJ found that Plaintiff's activities were "inconsistent with an individual suffering

from a disabling physical condition." (Tr. 18.)

The ALJ also found that Plaintiff "experienc[ed] no more than moderate

limitations on his overall functioning due to his depression." (Tr. 18.)  The ALJ cited a

treatment note from May 2014 from Dr. Serposs, in which Dr. Serposs described

Plaintiff's mood as fair and noted that Plaintiff was traveling to see his daughter.  (Tr.

18.)

The ALJ then turned to medical opinions in the record.  Beginning with Dr.

Johnson's consultative examination, the ALJ noted that Dr. Johnson determined that

while Plaintiff's "obesity exacerbated his difficulties and he did ambulate slowly and

exhibit some pain behavior, . . . [Plaintiff] was capable of ambulating without his cane."

(Tr. 18.)  And, while Plaintiff "has a history of depression, he was pleasant, cooperative

and talkative with an appropriate affect and sense of humor." (Tr. 18.)  Dr. Johnson also

found that Plaintiff's blood pressure was well controlled and Plaintiff has successfully

used a CPAP machine for over five years.  (Tr. 18.)  In addition, the ALJ cited Dr.

Johnson's findings that Plaintiff's "glaucoma is being successfully treated with laser

surgery and [Plaintiff] is able to drive and read a newspaper." (Tr. 18.)  While Dr.

Johnson noted "some 'mild osteoarthritis of the knees,'" there was no evidence of nerve

root irritation in Plaintiff's spine.  (Tr. 19.)  The ALJ "afforded weight [to Dr. Johnson's observations] to the extent they are consistent with [Plaintiff's] self-reported level of function and his ability to tend to his activities of daily living independently."  (Tr. 19.)

As for Dr. Karayusuf, the ALJ also cited notations regarding Plaintiff's ability to perform his activities of daily living independently, noting that Plaintiff lives alone, cooks and shops for himself, does laundry, and washes dishes.  (Tr. 19.)  Dr. Karayusuf concluded that Plaintiff "was able to perform a variety of mental tasks adequately and his depression appeared to be mild and in partial remission."  (Tr. 19.)  According to Dr. Karayusuf, "although [Plaintiff] should be restricted to superficial interactions with others, . . . he is able to understand, retain and follow simple instructions" and Plaintiff "would be able to maintain persistence and pace in the context of performing repetitive tasks."  (Tr. 19.)  The ALJ afforded Dr. Karayusuf's opinion "significant weight since he performed a thorough clinical interview and review of the claimant's medical history before arriving at his conclusions."  (Tr. 19.)  The ALJ also determined that "Dr. Karayusuf's opinion is consistent with [Plaintiff's] demeanor at the hearing, which is that of a man capable of returning to his past relevant work as a taxi-driver, as confirmed by the vocational expert's testimony."  (Tr. 19.)

With respect to Dr. Serposs, the ALJ accorded Dr. Serposs's June 2014 opinion that Plaintiff "has experienced disabling symptoms of depression since 2005 . . . minimal weight . . . ."  (Tr. 19.)  The ALJ concluded that Dr. Serposs's opinion "is inconsistent with [Plaintiff's] self-reported level of function and his demeanor at the hearing, which is that of a man capable of meeting the demands of a full-time work schedule on a sustained

basis, so long as that work allows for the limitations contained in the residual functional capacity finding . . . ." (Tr. 19.) Additionally, the ALJ afforded "minimal weight to the "extreme limitations" Dr. Serposs identified in the February 2014 opinion "in several areas of work-related function, that [Plaintiff] would be off task twenty-five percent . . . of the day and w[ould] miss four or more days from work per month" because "[l]imitations this restrictive seem exaggerated and are inconsistent with [Plaintiff's] level of independent function and his recent ability to travel independently." (Tr. 18.)

Based on the vocational expert's testimony, that Plaintiff could perform his past relevant work as a taxi driver, the ALJ found that Plaintiff was capable of working as a taxi driver and "[t]his work does not require a level of exertion or social interaction beyond [Plaintiff's] residual functional capacity." (Tr. 19.) Therefore, the ALJ concluded that Plaintiff had not been under a disability from May 28, 2009, through June 30, 2010. (Tr. 19.)

## VIII. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the

[ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. § 404.1512(a).  As stated above, Plaintiff must have been disabled prior to the date last insured in order to receive DIB.  *See Moore*, 572 F.3d at 522.  Plaintiff raises several assignments of error, challenging the ALJ's conclusion that Plaintiff did not meet listing 12.04; residual-functional-capacity determination, including the weight accorded to medical opinions and assessment of Plaintiff's credibility; and reliance on the testimony of the vocational expert.

### A. Insufficient Factual Findings

An ALJ "must adequately explain his or her factual findings in order to permit the Court to determine whether substantial evidence supports the decision."  *Hanovich v. Astrue*, 579 F. Supp. 2d 1172, 1205 (D. Minn. 2008); *see* Soc. Sec. Ruling 06-03p, *Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, 71 Fed. Reg. 45593-03, 45596 (Aug. 9, 2006) ("Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should . . . ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, . . . .").  "While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency has no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of

evidence can serve as a basis for remand." *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (quotation omitted).  Remand is appropriate when the ALJ's factual findings are not sufficient to afford meaningful review.  *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008); *see Willcockson v. Astrue*, 540 F.3d 878, 879-80 (8th Cir. 2008) (while errors and uncertainties in opinion might not individually warrant remand, combination created doubt about ALJ's rationale and required remand).  Here, for the reasons that follow, the Court concludes that the ALJ's findings are not sufficient to afford meaningful review and recommends that this matter be remanded for further proceedings with respect to steps three through five.

### B.  Meet a Listed Impairment

Plaintiff asserts that the ALJ erred in determining that Plaintiff's depression did not meet listing 12.04 for affective disorders.  "The claimant has the burden of proving that his impairment meets or equals a listing.  To meet a listing, an impairment must meet all of the listing's specified criteria."  *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010) (quotation omitted). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing.  An impairment that manifests only some of the listing criteria, no matter how severely, does not qualify."  *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (quotation omitted).

Under listing 12.04, affective disorders are "[c]haracterized by a disturbance of mood accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either

depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04. The required severity

for listing 12.04 "is met when the requirements in both A and B are satisfied, or when the

requirements in C are satisfied." *Id.*

Beginning with the A and B criteria**,** there does not appear to be a dispute over the

A criteria. (*See* Def.'s Mem. in Supp. at 16.) Indeed, the ALJ found that Plaintiff's

depression was a severe impairment. Plaintiff's depression must then also result in at

least *two* of the following B criteria: (1) marked restriction of activities of daily living;

(2) marked difficulties in maintaining social functioning; (3) marked difficulties in

maintaining concentration, persistence, or pace; or (4) repeated episodes of extended

decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04B. The ALJ found as

follows: "In activities of daily living, [Plaintiff] had mild restriction. In social

functioning, the claimant had moderate difficulties. With regard to concentration,

persistence or pace, [Plaintiff] had moderate difficulties. These findings will be

discussed in greater detail in paragraph 5 below." (Tr. 16.) The ALJ further found that

Plaintiff "experienced no episodes of decompensation, which have been of extended

duration, explaining that Plaintiff has not been psychiatrically hospitalized since 2003.

(Tr. 16.)

While the ALJ provided reasons for his determination that Plaintiff had not

experienced repeated episodes of extended decompensation and subsequently discussed

Plaintiff's activities of daily living, the ALJ did not explain why he found Plaintiff had

moderate limitations in both social functioning and maintaining concentration,

persistence, or pace. (*See* Tr. 18-19.) Essentially, the Court is left to speculate on what

basis, records, or activities the ALJ relied upon to reach these conclusions on the remaining two B criteria. Without an explanation of what evidence was relied upon by the ALJ to reach these conclusions, the Court is unable to determine whether substantial evidence supports the ALJ's determination that Plaintiff did not meet or equal at least two of the B criteria. *See Hanovich*, 579 F. Supp. 2d at 1205.

Under the alternative C criteria, Plaintiff had to establish that he had a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" and (1) "repeated episodes of decompensation, each of extended duration," (2) "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," or (3) "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04C. The ALJ's analysis of the C criteria consists of two sentences: "The undersigned has also considered whether the 'paragraph C' criteria were satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria."

The absence of a logical bridge between the evidence and the ALJ's conclusions regarding the B and C criteria is made more problematic by the fact that Plaintiff's treating physician, Dr. Serposs, submitted an opinion that would support the presence of at least two of the B criteria as well as a set of the C criteria, and that Plaintiff's condition

had been this way since 2002. The Commissioner contends that "Dr. Serposs'[s] opinion that Plaintiff satisfied the requirements for Listing 12.04 did not qualify as a medical opinion and was not entitled to any deference or special significance" because "the regulations specifically include the issue of whether a claimant meets or equals the requirements for a listing among the issues reserved solely for the Commissioner." (Def.'s Mem. in Supp. at 17.) The Commissioner is correct that the determination of whether Plaintiff's impairments meet or equal a listed impairment is ultimately reserved to the Commissioner and no special significance is given to opinions on issues reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(2) (final responsibility for deciding whether impairment(s) meet or equal the requirements of a listed impairment reserved to the Commissioner). Nevertheless, the regulations also state that the Commissioner will "consider opinions from medical sources on issues such as whether [a claimant's] impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1." *Id.* Plaintiff's treating physician is the only medical source who saw Plaintiff on a routine basis, approximately once per month during the relevant period. Yet, it remains unclear the degree of consideration, if any, given to the opinion of Dr. Serposs that Plaintiff's depression met or equaled listing 12.04 .

It is not the role of the Court "to reweigh the evidence or review the factual record de novo." *Masterson v. Barnhardt*, 363 F.3d 731, 736 (8th Cir. 2004). There may be good reasons for discounting Dr. Serposs's opinions. Other evidence in the record may support the ALJ's determination that Plaintiff did not meet the B or C criteria of listing 12.04. But such determinations all involve weighing of the evidence. This is the

function of the ALJ. *See id.* The Court is not able to determine whether there is substantial evidence in the record as a whole to support the ALJ's conclusion at step three when the ALJ has not explained adequately the evidence relied upon in determining that Plaintiff did not meet listing 12.04. *See Boettcher*, 652 F.3d at 863; *Scott*, 529 F.3d at 822; *see also Masterson*, 363 F.3d at 736 (courts "must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion"). Accordingly, remand is required.

### C. Other Assignments of Error

Because of the sequential nature of the evaluation process and the Court's determination that the ALJ erred at step three, the Court declines to engage in speculative assumptions to address whether the record contains substantial evidence to support the ALJ's findings concerning Plaintiff's residual functional capacity and his ability to perform past relevant work or any other kind of work, and therefore will not address individually the parties' remaining arguments. *Travis v. Astrue*, 11-cv-1808 (TNL), 2012 WL 4339107, at *26 (D. Minn. Sept. 18, 2012). The Court will, however, address a few points as they may be instructive on remand. *See Tallifer v. Colvin*, No. 14-cv-1281 (SRN/SER), 2016 WL 617121, at *19 (D. Minn. Jan. 29, 2016), *adopting report and recommendation*, 2016 WL 614380 (D. Minn. Feb. 16, 2016).

### 1. Residual Functional Capacity

Plaintiff's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy*, 648 F.3d at 614 ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects

of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). "Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the [residual functional capacity]." *Id.* "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Id.* (quotation omitted); *see* 20 C.F.R. § 404.1546(c). Plaintiff argues that the ALJ failed to weigh properly the medical opinions and his credibility when determining his residual functional capacity.

### a. Medical Opinions

In determining whether a claimant is disabled, the ALJ considers medical opinions along with the other evidence in the record. 20 C.F.R. § 404.1527(b); *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). The ALJ is tasked with resolving conflicts among the various medical opinions and "may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner*, 499 F.3d at 848 (quotation omitted). Regardless of its source, every medical opinion received is to be evaluated. 20 C.F.R. § 404.1527(c); *Miller v. Colvin*, 784 F.3d 472, 478 (8th Cir. 2015).

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th

Cir. 2005) (quotation omitted); *accord* 20 C.F.R. § 404.1527(c)(2); *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014); *Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014). "Yet[, this controlling weight] is neither inherent nor automatic and does not obviate the need to evaluate the record as [a] whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted); *accord Bernard*, 774 F.3d at 487 ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control."). "The [C]ommissioner may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Cline*, 771 F.3d at 1103 (quotation omitted); *see Bernard*, 774 F.3d at 487 ("An ALJ may also give less weight to a conclusory or inconsistent opinion by a treating physician."). "Whether granting a treating physician's opinion substantial or little weight, the [C]ommissioner must always give good reasons for the weight she gives." *Cline*, 771 F.3d at 1103 (quotation omitted).

Unless the ALJ gives a treating source's opinion controlling weight, the following factors are used in determining the weight to be given to any medical opinion: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other pertinent factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(c); *Wagner*, 499 F.3d at 848. Moreover, the opinions of one-time examiners and non-examining consultants generally do not constitute substantial evidence in the record as a whole, "especially when contradicted by the evaluation of the claimant's treating physician." *Wagner*, 499 F.3d at 849 (quotation omitted); *accord*

61

*Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) ("A single evaluation by a nontreating psychologist is generally not entitled to controlling weight."); *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) ("The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole.").

Here, the ALJ gave greater weight to the opinions of the consultative examiners, Drs. Johnson and Karayusuf, over the opinions of Plaintiff's treating physician, Dr. Serposs. It is not clear the weight assigned to the opinions of the non-examining state agency consultants. In fact, any opinions other than those of Drs. Johnson, Karayusuf, and Serposs, were dealt with in a single, cursory statement that "[a]ll other sources [we]re given appropriate weight in arriving at [Plaintiff's] Residual Functional Capacity and other conclusions." (Tr. 19.) The Court is left to guess at what the ALJ considered to be an "appropriate weight" and why. Given that the ALJ did not accord controlling weight to Plaintiff's treating physician, the Court would have expected a more robust discussion of the factors in section 404.1527(c) when considering the other medical opinions, especially since Dr. Serposs appeared to be opining on Plaintiff's condition as it existed during the relevant period, not just in 2014 as the Commissioner contends.

Further, in at least one instance, the ALJ's justification for the weight assigned to a medical opinion was not supported by the record. The ALJ cited Dr. Karayusuf's "review of [Plaintiff's] medical history" as a basis for giving Dr. Karayusuf's opinion "significant weight." (Tr. 19.) In his opinion, however, Dr. Karayusuf expressly stated that there were no medical reports available for him to review. (Tr. 625.)

In the end, while the ALJ's residual-functional-capacity finding need not be support by a specific medical opinion, it must be supported by some medical evidence of the claimant's ability to function in the workplace. *Hensley v. Colvin*, 829 F.3d 929, 932 (8th Cir. 2016). Absent an adequate explanation as to how the ALJ weighed the medical opinions in the record, the reasons proffered by the ALJ in support of the residual-functional-capacity finding—Plaintiff's activities, a trip to New York four years after the relevant period, and the ALJ's observations of Plaintiff at the hearing—give the appearance that the ALJ substituted his own opinion for those of the medical experts. *See Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008) ("An ALJ must not substitute his opinions for those of the physician.") (quotation omitted); *see also Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008) ("While the ALJ's observations cannot be the sole basis of his decision, it is not an error to include his observations as one of several factors.").

### b. Credibility Determination

At the same time, the Court recognizes that although a residual-functional-capacity finding must be supported by some medical evidence, "an ALJ is not limited to considering medical evidence exclusively." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); *see Perks*, 687 F.3d at 1092. In determining a claimant's residual functional capacity, an ALJ takes into account the claimant's subjective complaints, evaluating the credibility of such complaints. *See Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016); *Perks*, 687 F.3d at 1092.

In the Eighth Circuit, the *Polaski* factors are used to evaluate a claimant's subjective complaints. *Halverson*, 600 F.3d at 931 (citing *Polaski v. Heckler*, 739 F.2d

1320 (8th Cir. 1984)); *Hightower v. Colvin*, No. 15-cv-202 (SER), 2015 WL 12683980, at *17 (D. Minn. Nov. 3, 2015).  When

> assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009); *see Halverson*, 600 F.3d at 931. "The ALJ is not required to discuss each *Polaski* factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Halverson*, 600 F.3d at 932 (quoting *Moore*, 572 F.3d at 524).  Courts "will defer to an ALJ's credibility finding so long as the ALJ explicitly discredits a claimant's testimony and gives good reasons for doing so." *Hensley*, 829 F.3d at 934 (quotation omitted).

Plaintiff is essentially asking this Court to reweigh his credibility.  "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Moore*, 572 F.3d at 524 (quotation omitted).  The ALJ gave a number of good reasons for discrediting Plaintiff's subjective complaints.  For example, focusing on Plaintiff's daily activities, the ALJ noted how such activities collectively demonstrated Plaintiff's ability to function independently and were inconsistent with Plaintiff's allegations of disability. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) ("Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.").  Additionally, the ALJ pointed out that the objective medical evidence did not support the alleged intensity and limiting effects of Plaintiff's back and knee pain.

*See Medhaug v. Astrue*, 578 F.3d 805, 816-17 (8th Cir. 2009) (lack of objective medical evidence to support complaints of disabling pain properly considered alongside response to treatment, work activities, and activities of daily living when assessing credibility). The ALJ also pointed out that Plaintiff's blood pressure had improved with medication and his depression and glaucoma were responding to treatment. *See id.* at 813 ("An impairment which can be controlled by treatment or medication is not considered disabling.").

One of the reasons given by the ALJ for finding Plaintiff not fully credible, however, gives the Court pause, and warrants further discussion: Plaintiff's trip to New York. In order to receive DIB, Plaintiff must have been under a disability prior to the date last insured, which was in *2010*. Plaintiff went to New York in *2014*. The ALJ found that this trip was "activity . . . inconsistent with an individual suffering from a disabling physical condition" and demonstrative of Plaintiff's "ability to travel independently." (Tr. 18.) While a claimant's activities are relevant to assessing credibility, the Court is hard pressed to conclude, without further explanation, that travel four years later is evidence of Plaintiff's ability to function during the relevant period.

### 2.  Hypotheticals Posed to Vocational Expert

Finally, on remand, the ALJ will also have to revisit whether Plaintiff is capable of performing his past relevant work and, if not, whether he can perform any other kind of work. Should vocational-expert testimony be necessary, the ALJ should take greater care in crafting the hypotheticals posed to the vocational expert. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Perkins v.*

*Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (quotation omitted); *see O'Neill v. Astrue*, 762 F. Supp. 2d 1158, 1178 (D. Minn. 2011) ("A hypothetical question posed to a vocational expert must relate with precision to all of the claimant's impairments.").  The Court agrees with Plaintiff that the hypotheticals posed in this case were quite convoluted. Greater precision in the future will allow the Court to determine whether the concrete consequences of Plaintiff's deficiencies were indeed captured in the hypothetical(s) and thus whether the vocational expert's response constitutes substantial evidence to support the ALJ's decision.  *See Martise*, 641 F.3d at 927.

[Continued on next page.]

## IX. RECOMMENDATION

Based on the foregoing, and all the records, memoranda, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (ECF No. 15) be **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment (ECF No. 17) be **DENIED**.

3. The Commissioner's decision be **AFFIRMED** as to steps one through two and **VACATED** as to steps three through five.

4. The case be **REMANDED** to the Commissioner for further proceedings.

Date: January__26__, 2017

                                        _s/ Tony N. Leung_
                                        Tony N. Leung
                                        United States Magistrate Judge
                                        for the District of Minnesota

                                        _Weber v. Colvin_
                                        Case No. 16-cv-332 (JNE/TNL)

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.